141 P.2d 192

**STATE ex rel. HUGHES v. CLEVELAND,**
Secretary of State.

No. 4791.

Supreme Court of New Mexico.

Sept. 11, 1943.

M. W. Hamilton, of Santa Fe, A. T. Hannett, Claud S. Mann, and George R. Craig, all of Albuquerque, and J. M. Hervey, of Roswell, for relator.

Edward P. Chase, Atty. Gen., and C. C. McCulloh, Harry L. Bigbee, and Robert W. Ward, Asst. Attys. Gen., for respondent.

SADLER, Chief Justice.

The question primarily to be determined is whether L. 1943, c. 95, imposing a tax on cigars and cigarettes, and allocating the proceeds of the levy to old age assistance through the Department of Public Welfare, is exempt from a popular referendum under Constitution Article 4, § 1, as a measure providing for the preservation of the public peace, health or safety. Secondarily, but for decision only if the act be held referable, we have the question whether petitions for referendum filed on the ninety-first day following adjournment of the Legislature, the ninetieth day falling on Sunday, are seasonably filed.

Petitions for a reference of the challenged act, which for the purposes of deciding the first question will be deemed in all respects sufficient to effect suspension, were seasonably tendered to the Secretary of State for filing. She refused to file them, assigning as a reason that under the referendum clause of the Constitution she was neither obliged nor permitted to file petitions seeking reference of a law providing for preservation of the public peace, health or safety, of a kind which she deemed the act involved to be. Thereupon this action in mandamus against such state official as respondent was instituted before us, to compel filing of the petitions, and we have taken original jurisdiction of the case by issuing an alternative writ. The respondent has answered, the cause has been argued, and we now must answer the one question and, contingently, the other hereinabove stated.

The act involved, as already noted, imposes an excise tax on cigars and cigarettes and allocates the net proceeds of collections to old age assistance through the Department of Public Welfare. In a preamble to the act there appear the following recitals, to-wit:

"Whereas, cognizance is taken of the extreme need now existent among the needy aged, of this state, and

"Whereas, the funds provided presently are not adequate to undertake and ad-

minister proper relief to this unfortunate element of our population, and

"Whereas, the funds available presently are not commensurate with the need in some cases;

"Now, Therefore, Be it declared the policy of this state that the revenues derived by this act are extremely needed to alleviate this unfortunate situation."

Section 14 of the act provides:

"Section 14. Department of Public Welfare Fund.

"(a) All revenues including taxes, penalties, interest and license fees collected under this act shall be paid over to the State Treasurer, and shall be placed by him in a fund to be known as the 'Department of Public Welfare Fund' for old age assistance.

"(b) At the end of each month all sums remaining in said Department of Public Welfare Fund for old age assistance shall by the State Treasurer be permitted to be drawn upon for the purposes of old age assistance exclusively to be indicated by law in the appropriation act covering said Department."

Reference to the Public Welfare Act (1941 Comp. §§ 73-111 to 73-122) discloses that in order to be eligible for old age assistance the recipient among other conditions must be over sixty-five years of age, destitute and not an inmate of any public institution. Assistance is to be granted among others to an eligible needy aged person who "has not sufficient income or other resources to provide a reasonable subsistence compatible with decency and health." § 73-111. The amount thereof is to be determined by the department "with due regard to the resources and necessary expenditures of the case, * * * and shall be sufficient, when added to all other income and support available to the recipient, to provide such person with a reasonable subsistence compatible with decency and health." § 73-115.

■ We may and should assume that the Legislature in enacting the questioned measure was moved, in part, by an anticipated large decrease in revenues available for this type of assistance, as pointed out by the State's Chief Executive, the Honorable John J. Dempsey, in a message read personally before a joint meeting of the House and Senate on February 4, 1943, while the bill was under consideration by the Legislature. The Governor's message also advised the joint session that the average amount available for old age assistance was approximately $19 per month per person; that the total loss to the Department of Public Welfare from a falling off in receipts from the liquor and compensation tax would approximate $360,000, which under the system of matching with federal funds for relief of this type would eventuate in an ultimate loss of revenues to the department of $720,000 available for the forms of relief extended. Mention, too, was made of the rising cost of living and the progressively diminishing purchasing power of such funds

as were granted for old age assistance. Attention was called to the fact that approximately five thousand aged persons in New Mexico were being assisted at that time through the Department of Public Welfare, a figure borne out by the report of a special legislative committee named to investigate such department.

█ █ That the conditions pointed out in the message of the Chief Executive as well as in the report of the special legislative committee form the background of the legislative finding of urgent need appearing in the preamble, we entertain no doubt. Presumably the Legislature through appropriate committees or otherwise, satisfied itself of the accuracy of the conditions brought to its attention by the Governor. It was its duty so to do and we may assume it did. State ex rel. Short v. Hinkle, 116 Wash. 1, 198 P. 535. Our right, if not our duty, to notice judicially the message of the Governor before the joint session of both houses of the Legislature convened to receive the same cannot be considered doubtful in view of the governing rule to be found in 1941 Comp., § 19-101, Rule 44(d) (3). See also 20 Am. Jur. 67, § 44 "Evidence". Likewise the right to notice judicially the report of the legislative committee appears supported by reason as well as authority. 20 Am.Jur. 64, § 41 "Evidence"; State v. Torbert, 200 Ala. 663, 77 So. 37; State v. Gordon, 236 Mo. 142, 139 S.W. 403.

So much for the background of the questioned legislation. We come now to consider whether the same is exempt from a popular referendum under Section 1, Article 4, of the Constitution, denying application of the power reserved to the people, among others, to any "laws providing for the preservation of the public peace, health or safety". In Hutchens v. Jackson, 37 N.M. 325, 23 P.2d 355, in construing section 23 of Article 4 of the Constitution, authorizing the Legislature to put into immediate effect upon the conditions stated "any act necessary for the preservation of the public peace, health or safety", we held a legislative declaration of emergency passed by the required vote in each house was conclusive upon the courts as affecting the time when the law should go into effect. We felt called upon, however, to warn against the assumption that the same conclusiveness would be given such a declaration as precluding an attack by referendum, when that question should be properly before us. This admonitory language was felt proper because of the somewhat similar language employed in the two constitutional provisions.

That the warning was timely soon was demonstrated. Todd v. Tierney, 38 N.M. 15, 27 P.2d 991, came on for decision less than six months later. We there held that the declaration of emergency, authorized by Section 23 of Article 4 of the Constitution, appended to the act in question, while placing it in immediate effect and beyond the power of suspension by a referendum petition, nevertheless, left the question of the act's referable character open to future determination by the courts in

the event a petition seeking referendum should thereafter be filed. An opinion on rehearing in Todd v. Tierney, authored by then Chief Justice Watson, stated such as the result to be deduced from that decision. Several opinions by different justices had been filed disclosing the court divided four to one on the question of suspensibility of the act and three to two on that of referability in view of the presence of the emergency clause.

The correctness of this appraisal of the holding in Todd v. Tierney is affirmed by what is said in Flynn, Welch & Yates, Inc., v. State, 38 N.M. 131, 28 P.2d 889, decided shortly thereafter. With the law on the subject thus clarified, there then came on for hearing Hutcheson v. Gonzales, 41 N.M. 474, 71 P.2d 140, in which case we held that a law proposing an amendment to the Constitution, if to be deemed a "law" under Constitution, Article 4, § 1, is exempted from a referendum as one "providing for the preservation of the public peace, health or safety". Otherwise than in the cases mentioned, we have had no occasion to construe or interpret the referendum clause in our Constitution in the respects here involved.

Consideration of the provision in the cases mentioned, however, and further study and research upon the subject following submission of the case at bar are convincing of what seems agreed by opposing counsel that the language of the provision in our Constitution is sui generis in one respect. There is none other like it in the twenty states whose constitutions reserve to the people a veto power over all laws save those enumerated as exempt from the veto power. In most, if not all, of the other constitutions providing for the referendum the language of exemption is "laws *necessary* for the *immediate* preservation of public peace, health or safety", or that in substance. The words "necessary" and "immediate" are missing from the provision in our Constitution.

The fact of the absence of these words, significant in and of itself when compared with the language of practically all other state constitutions employing them, is rendered doubly so when noticing judicially, as we may and do, that a minority report of the Committee on Legislative Department proposed to the Constitutional Convention both the initiative and the referendum, suggesting as a substitute for the language actually employed in the referendum clause the exception of "laws for the *immediate* preservation of the public peace, health and safety, by petition signed by 8% of the legal voters of the state * * *", and that this minority report was rejected, thus denying the initiative provision and employing the much broader language of exemption found in the Constitution as proposed and adopted. These considerations may explain Mr. Justice Bickley's reference in his special opinion in Todd v. Tierney, supra [38 N.M. 15, 27 P.2d 1009], to "the rather broad exceptions from referendum named in section 1 of article 4."

It thus can be seen that the framers of our Constitution in proposing, and the people of the Territory in adopting, advisedly employed the broader and less liberal language. In this connection it is noticeable that practically all state constitutions (in fact all but that of Kentucky, we believe) which provide for the referendum likewise provide some form of the initiative. These two reserved powers seem, as to nearly all states, to go hand in hand. Although proposed and its adoption urged by the minority representation in the Constitutional Convention, as the official proceedings of the Convention disclose, no provision was made for the initiation of legislation by the people. This is significant and furnishes further proof that our constitution makers were imbued with an undeniably conservative idea as to the desirability of, or necessity for, either the initiative or referendum.

The difference in the language of our referendum provision from that found in the constitutions of most other states renders of doubtful value decisions from those jurisdictions attaching referable character to a given enactment and lends greater persuasiveness to their decisions denying it such character. For, it must be obvious to all that many laws could reasonably provide for the preservation of the public peace, health or safety, without being deemed *necessary* for their *immediate* preservation. On the other hand, as observed in the opinion by Mr. Justice Sadler in Todd v. Tierney, it would be difficult to conceive of a law necessary for the preservation of the public peace, health or safety which did not provide therefor.

This brings us then to a consideration of the decisive question whether the act does reasonably provide for the preservation of the public peace, health or safety. If it provides for the preservation of any one, that is enough. We need not attempt to relate this act to the public peace or to the public safety, though either conceivably could be in some degree affected by a denial of the relief afforded by the act. Obviously, however, it bears a more direct relationship to the public health. And we find no difficulty in sensing a valid relationship to the public health in a law proposing to raise funds with which to provide approximately five thousand needy aged in the State "a reasonable subsistence compatible with decency and health". 1941 Comp., § 73-111.

Cold and hunger have been twin enemies of the human race from the days of cave man existence. Since the dawn of time they have contributed more to the discomfort, anxiety and peril of human existence than any other forces with which man has had to contend. We utter a truism when we say that food, clothing and shelter are essential to health. None, then, can gainsay the fact that the health of the five thousand needy aged of the State is imperiled if they have not food enough to repel hunger nor clothing and shelter adequate to withstand exposure. Medical research and scientific discovery have made it common knowledge that the ill clad and under-

nourished of any age group become the prey of every disease the "human flesh is heir to". When, therefore, to the under-nourished body are added the natural infirmities of old age, there arises a susceptibility to disease, communicable or otherwise, higher than that in any other class of our citizenry. We cannot ignore the fact that the health of all the people of the state becomes involved if the bodies of five thousand needy aged, spread geographically over the entire State, through lowered resistance incident to under-nourishment, are made ready receptacles for the multiple germ initiated diseases which attack the people of all communities.

■ We do not reject the idea that provision for the health of the sixty-five year and above age group, standing alone, might become a proper matter of state concern. The fact that a measure does not affect all or even a major portion of the people of the State does not deny it character as a public health measure. Cf. Arnold v. Board of Barber Examiners, 45 N.M. 57, 109 P.2d 779; Bunting v. State of Oregon, 243 U.S. 426, 37 S.Ct. 435, 61 L.Ed. 830, Ann.Cas.1918A, 1043. A large majority of the people of the State live on farms and ranches and would not be directly affected by a law requiring installation of sewers in towns and cities, yet one could scarcely deny character to such a measure as being in the interest of the public health nor successfully challenge it as providing for the preservation thereof. But, as indicated, our appraisal of this act as a public health measure need not rest alone on the health status of the five thousand destitute aged, considered to themselves. When we recognize their high susceptibility to contagious and infectious diseases, by reason of an under-nourished condition, and face the likelihood that many of their number will contract such diseases, thus becoming sources of infection and danger to all within the community where each resides, the weight of this consideration added to that of the imperiled health of each of them from lack of adequate food and clothing, can leave little doubt that the measure does have a real and substantial relationship to the public health.

■■ All that is required to bring the questioned law within the proper sphere for an exercise of the police power is that it bear a valid relationship, as we have expressed it, to some permissible object for the exercise of that power. In other states, courts have said the law must have "a real and substantial relation" to such objects, State v. Nelson, 126 Conn. 412, 11 A.2d 856, 860; or, an "ascertainable relevancy" thereto, State Racing Commission v. Latonia Agricultural Ass'n, 136 Ky. 173, 123 S.W. 681, 25 L.R.A.,N.S., 905. In Mitchell v. City of Roswell, 45 N.M. 92, 111 P.2d 41, 44, we said: "It is the policy of the courts to uphold regulations intended to protect the public health, unless it is plain that they have no real relation to the object for which ostensibly they were enacted, and prima facie they are reasonable."

The relationship of hours of labor for women to health was thought by our country's highest court close enough to uphold as a proper exercise of the police· power a state law fixing maximum hours. Muller v. State of Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551, 13 Ann.Cas. 957. A similar law fixing maximum hours for men employed in certain industries was sustained as a health measure a few years later. Bunting v. State of Oregon, supra. In State v. Henry, 37 N.M. 536, 25 P.2d 204, 90 A.L.R. 805, we indicated the view that if the statute involved were legislatively labeled, as was the Oregon statute in the Bunting case, as a health measure, and had our approval as such, the federal tribunal would not invoke the distinctions between ten hours and eight hours and between manufacturing and mercantile establishments, to strike it down. Again, in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330, the health factor was thought sufficiently related to justify the United States Supreme Court in sustaining a Washington statute which authorized the fixing of minimum wages for women. In the majority opinion which overrules Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238, Mr. Chief Justice Hughes quotes approvingly from the language of Mr. Justice Holmes' opinion in the Adkins case as follows [300 U.S. 379, 57 S.Ct. 584, 81 L.Ed. 703, 108 A. L.R. 1330]: "This statute does not compel anybody to pay anything. It simply forbids employment at rates below those fixed as the minimum requirement of health and right living." The opinion in the West Coast Hotel Co. case continues: "What can be closer to the public interest than the health of women and their protection from unscrupulous and overreaching employers? And if the protection of women is a legitimate end of the exercise of state power, how can it be said that the requirement of the payment of a minimum wage fairly fixed in order to meet the very necessities of existence is not an admissible means to that end?" It would indeed be a strange logic which can discover a proper health factor in the amount of wages received by those of a class able and strong enough to work and yet fail to sense it in a measure providing a small sustenance to those who, through adversity and advancing age, have no wage at all nor other income.

In the well reasoned case of Housing Authority v. Dockweiler, 14 Cal.2d 437, 94 P.2d 794, 801, the court had no difficulty in relating the matter of slum-clearance to the public health. In supporting the constitutionality of the California slum-clearance act it is said: "Through the projects contemplated by the above statutes elimination of insanitary and unhealthy conditions is brought about by clearing premises of unfit dwelling buildings, and removing the *degrading* and *unwholesome* conditions existing in such surroundings, thereby reducing or preventing disease and crime and aiding and benefiting the health, morals and safety of the community." (Emphasis ours.) At this point we are

moved to inquire whether an unsanitary or unfit habitation is more degrading and unwholesome, and thus offers greater possibilities as an incubator of disease, than a hungry and unsanitary body of a human being? The question supplies its own answer.

A fair analogy in this respect may be found in the numerous decisions upholding as constitutional like slum clearing statutes. Such statutes are of comparatively recent origin and most of them have been enacted subsequent to and in the light of the United States Housing Act of 1937, 42 U.S.C.A. §§ 1401–1430. The act authorized the employment of the nation's funds and credit to assist the several states and their political subdivisions "to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation". The numerous state acts thereafter adopted "dovetail into the United States Housing Act". Chapman v. Huntington, W.Va., Housing Authority et al., 121 W.Va. 319, 3 S.E.2d 502, 507. In the case of Housing Authority v. Dockweiler, supra, it is observed that of some fifteen states that had been called upon up to that time to pass upon the constitutionality of slum-clearance acts of their respective states, the legislation had been upheld in each of them without exception, upon the ground, generally, as being in support of public health, safety, and morals.

Only one decision, so far as our research discloses, has declared itself on the direct question of the relationship of old age assistance to the public health. It is the case of Los Angeles County v. La Fuente, 20 Cal.2d 870, 129 P.2d 378, 382, where the court had before it the old age security law, whose constitutionality was assailed in several respects. It apparently was taken for granted in that case that the proper relationship between old age assistance and the public health existed for the court said: "The care and relief of aged persons who are in need clearly may be a special matter of state concern in promoting public health and welfare, * * *."

In Perley v. State of North Carolina, 249 U.S. 510, 39 S.Ct. 357, 358, 63 L.Ed. 735, the reasonableness of a police measure requiring the burning or removal of debris from cutover timber on water sheds was assailed. The litter remaining was "absolutely harmless", it was urged. The argument did not prevail for, as a source of danger, the court considered that the litter "may become dry * * * and therefore become a source of fires and the perils and damage of fires."

The temptation to steal held out to the moral detriment of children of tender years by the existence of places for the ready sale of junk was thought sufficient to sustain, as a police measure, a law or ordinance preventing the purchase of junk from children under sixteen years of age.

People v. McGuire, 113 App.Div. 631, 99 N.Y.S. 91.

While it is true the question of exemption from referendum was not directly presented in the foregoing decisions, this fact in no way weakens their persuasiveness. Certainly, it may not be successfully argued that there is one test for determining the constitutionality of a statute as representing, for instance, a reasonable exercise of the police power as involved in the referendum clause of our Constitution and still another for deciding the referability of the same measure. The reason is obvious since, if the constitutional validity of the legislation be sustained as a reasonable exercise of such police power, its nonreferable character is thereby automatically and indubitably established.

After all it was for the Legislature to appraise the danger apprehended and move to meet it. Within constitutional bounds, the propriety, wisdom, necessity, utility and expediency of legislation are matters for its determination. 11 A.Jur. 804; In re Proposed Middle Rio Grande Conservancy District, 31 N.M. 188, 242 P. 683.

Nor is it essential that a present necessity should exist before the legislature moves under the police power. It may act to prevent apprehended dangers as well as to control those already existing. Gutierrez v. Middle Rio Grande Conservancy District, 34 N.M. 346, 282 P. 1, 70 A.L.R. 1261; Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138.

The suggestion that old age assistance furnished through the Department of Public Welfare is a "pension" overlooks the essential nature of a pension. It is a periodical allowance or bounty for past services rendered to the public. Price v. Society for Savings, 64 Conn. 362, 30 A. 139, 42 Am.St.Rep. 198. The grants for old age assistance have none of the earmarks of a pension unless it be the periodical method of their payment.

It is also suggested that this act partakes of the character of social legislation, albeit, doubtless, commendable social legislation. If conceded, this in no manner detracts from its character as a health measure. Social and health legislation often are so closely related that in some cases it would be difficult to discover the line of demarcation between them.

We are unable to say that, within the proper exercise of its functions, the Legislature could not have sensed the dangers to the public health which it sought to forestall and prevent by enactment of the measure in question. If the issue were doubtful it would be our duty to resolve it in favor of the legislative determination and constitutionality. In re Southern Pac. Co., 37 N.M. 11, 16 P.2d 402; State ex rel. Hannah v. Armijo, 38 N.M. 73, 28 P.2d 511; People v. Witte, 315 Ill. 282, 146 N. E. 178, 37 A.L.R. 672; Bonnett v. Vallier, 136 Wis. 193, 116 N.W. 885, 17 L.R.A.,N. S., 486, 128 Am.St.Rep. 1061.

Wholly aside from the morality of the philosophy which, although hunger of the needy aged continues, would deny legislative power to make adequate provision to avert until disease actually had invaded their ranks in force, we think a realistic view will uphold the power to move to forestall such a danger. A like philosophy carried to logical conclusion would deny character as a health measure to legislation authorizing the cleaning up of swampy lagoons, infested by malaria-bearing mosquitos, until malaria had reached epidemic state. Kinnie v. Bare, 68 Mich. 625, 36 N.W. 672; Billings Sugar Co. v. Fish, 40 Mont. 256, 106 P. 565.

Nor is it our idea that the people in adopting our Constitution were more jealous of the privilege of debating under the then novel reserved power, for instance, conflicting theories of how to care for the poor than they were concerned in giving into the hands of their duly elected representatives under the exceptions therefrom freedom to judge and deal with safety measures such as this. After all, we have a representative form of government. The delegates to our Constitutional Convention were schooled by tradition in representative government. At the time it convened the initiative and referendum were largely new and untried. The convention moved cautiously in the matter, rejecting the initiative altogether and giving us the referendum carrying a broader exemption in the safety clause than is to be found in any other state constitution. There was nothing covert or concealed in the matter.

On the contrary, the question was widely publicized in the press and from the platform all over the State and the Constitution was adopted with a full knowledge by all of just what it did and did not have on the subject.

It discloses a misconception of the true nature of the power reserved by Constitution, Article 4, § 1, to assert that under it the people become a part of the legislature. All and plenary legislative power is vested in "a senate and house of representatives" with only the power reserved "to disapprove, suspend and annul any law enacted by the legislature"—a veto power closely akin to that of the Governor with the difference that his is general over all legislation and that of the people is conditional as limited by the Constitution. The reserved power, as will be noted, is tied in very closely by the Constitution to the exercise of the police power.

The police power "is not a rule; it is an evolution." 28 R.C.L. 742, § 36; State v. Mountain Timber Co., 75 Wash. 581, 135 P. 645, L.R.A.1917D, 10. Laws providing for preservation of the public peace, health and safety are essentially police measures and represent an exercise of this inherent power. It is the broadest power possessed by governments and rests fundamentally on the ancient maxim "salus populi est suprema lex". Traditionally, it was limited in its operation to laws concerned with the public health, safety and morals. This historic field for its operation now has been extended to

embrace laws for the promotion of the general welfare, prosperity, comfort and convenience. Chicago, B. & Q. R. Co. v. State of Illinois, 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596, 4 Ann.Cas. 1175; Nashville, C. & St. L. R. Co. v. Walters, 294 U. S. 405, 55 S.Ct. 486, 79 L.Ed. 949; State v. J. M. Seney Co., 134 Md. 437, 107 A. 189; McElhone v. Geror, 207 Minn. 580, 292 N.W. 414; Pepsodent Co. v. Krauss Co., 200 La. 959, 9 So.2d 303. However, when the framers of our Constitution came to write the language of this exemption in the referendum clause, they seem to have confined its scope to laws falling under a traditional definition of the police power. Whether this be so or not, it is noteworthy that the law here involved, one concerned with the public health, falls readily into place under the narrower traditional concept of the police power.

■ If it seem desirable that a larger reservation of power be lodged in the people under which the popular veto of legislation may be exercised, the remedy is not through the courts, whose only function is to construe the language actually employed, but rather through an amendment to the Constitution using language of similar import to that urged upon, but rejected by, the constitution makers in 1910. The addition of the words "necessary" or "immediate preservation", so commonly employed in other constitutions, undoubtedly would broaden the scope of the reserved power.

■ The Legislature, in enacting the questioned law, moved to supply funds for the Department of Public Welfare with which it might provide old age assistance to the destitute aged. It finds "extreme need now existent among the needy aged" and an inadequacy of funds to "administer proper relief to this unfortunate element of our population". True, this act says nothing about "health", but the funds are for the exclusive use of the Department of Public Welfare in extending old age assistance and the Public Welfare Act more than once declares a fundamental purpose of providing "a reasonable subsistence compatible with decency and health". 1941 Comp., §§ 73-111 and 73-115. The two statutes as respects old age assistance deal with the same subject and to such extent are to be considered in pari materia. The fact that the later statute makes no reference to the former can make no difference since the Legislature must be presumed to have had the former statute in mind without expressly referring to it. State ex rel. Red River Valley Co. v. District Court of the Fourth Judicial District, 39 N.M. 523, 51 P.2d 239.

■ While the courts are not bound by legislative declarations in matters of this kind, they are entitled to great weight and unless patently untrue or absurd, they will be respected. Arnold v. Board of Barber Examiners supra; State ex rel. Short v. Hinkle, supra; Cf. Stevenson v. Colgan, 91 Cal. 649, 27 P. 1089, 14 L.R.A. 459, 25 Am.St.Rep. 230. We accord the Legislature a broad field of discrimination in classifying for purposes of legislation. Davy v. McNeill, 31 N.M. 7, 240 P. 482;

Hutcheson v. Atherton, 44 N.M. 144, 99 P.2d 462; State v. Pate, 47 N.M. 182, 138 P.2d .1006. We see no good purpose in holding it to a stricter rule in deciding what is reasonable provision for the public health than in determining what is reasonable classification for purposes of Legislation.

■■ Nor is it for the court to say that because funds claimed to be now rapidly accumulating from savings by the executive department of the state government might be used to provide for this class of the populace, as contended for by relator, that the legislation in question might serve no necessary purpose. It is for the legislative branch of the goverment to determine to what source it will look for such funds; it is not for this court to say whether it has gone to the most appropriate source therefor. Moreover, the question arises whether special legislative authority might not be required to render available for old age assistance any of such accumulated savings now in the State treasury.

■■■ Confronted with the fact that the pittance doled out to the needy aged of the State as grants was rapidly dwindling due to the rising cost of living, to be further greatly reduced by a substantial loss in revenues earmarked for such relief, the Legislature acted to meet the situation so as to provide funds with which such aged persons might maintain themselves above a bare subsistence level. Funds for our needy aged whose power to resist disease is fast ebbing incident to the debilities of old age, and sufficient in amount to provide "a reasonable subsistence compatible with decency and health" —such seems the end and the aim of the questioned act. It is not our province to declare the Legislature acted unwisely. Perhaps it did not wish to have it said that such help as it rendered had proved too little and too late. We do not think a logical relationship between the questioned act and the public health is wanting. Los Angeles County v. La Fuente, supra; Arnold v. Board of Barber Examiners, supra; Bunting v. State of Oregon, supra; West Coast Hotel Co. v. Parrish, supra; Muller v. State of Oregon, supra; Housing Authority v. Dockweiler, supra.

Holding as we do, that the act provides for the preservation of the public health, it becomes unnecessary to determine whether the referendum petitions tendered for filing on the ninety-first day following adjournment of the Legislature were seasonably presented for filing.

It follows from what has been said that the alternative writ of mandamus was improvidently issued and should be discharged.

It is so ordered.

MABRY, BRICE, and THREET, JJ., concur.

BICKLEY, Justice (dissenting).

I am unable to concur in the reasoning or in the result reached by the majority.

They say the tobacco tax statute provides for the preservation of the public health. Whether it does so provide is the only question in the case.

When a public officer refuses to file petitions for a referendum on the ground that the law in question is not subject to referendum, the burden is upon such officer in a mandamus proceeding to show that clearly and obviously the questioned law is one that provides for the preservation of the public peace, health or safety or otherwise falls within the exceptions to the referendum. Since it is not contended by anyone that the public peace or safety are involved, the inquiry is narrowed as to whether the act provides for the preservation of the public health.

We are called upon to decide the question from such evidence as the record affords in the light of established rules of construction.

From the four corners of the act we see that it is a revenue measure and that the revenues obtained are to be used to make money payments to persons in need who are 65 years of age or over, *in addition* to the "service, aid, assistance or relief whether monetary or otherwise" granted to *any* needy person.

Respondent's argument is that the relief is to be granted to only the aged needy who have not sufficient income or other resources to provide a reasonable subsistence compatible with decency and health and that thus we have a legislative declaration that

the public health is imperiled if a standard of living is not maintained at the expense of the state for all of its citizens, compatible with the ideas of the Department of Public Welfare as to what is decency and health.

Since the legislature has not here defined the public health or even defined private decency and health, perhaps our only concern will be to find out what the constitution makers understood to be the meaning of the phrase "public health". We have many guideposts which should lead us to a correct conclusion.

In discharging our task we should look to well defined definitions of words, to rules of construction and to such statutes as existed at the time of the adoption of the constitution in which similar words were employed. Sutherland on Statutory Construction, 2nd Edition, Sec. 358 says: "So the meaning of particular words in a recent statute will have weight; and their meaning may be inferred from earlier statutes in which the same words or language has been used *where the intent was more obvious.*" (Emphasis supplied.)

In an effort to show the common understanding of men as to what is meant by "public health", I refer for convenience to Ch. 71 of N. M. Statutes 1941, Annotated, which bears the title "Public Health and Safety." Art. 1 of this chapter establishes a State Department of Public Health, and Sec. 71-104 sets out a list of the activities of the health department, some of which are as follows:

"1. Supervise the health of the people of the state.

"2. Investigate, control and abate the causes of diseases, especially epidemics, sources of mortality and effects of localities, employment and other conditions of public health.

"3. Inspect public buildings, institutions, premises and industries and to regulate the sanitation thereof in the interest of public health.

"4. Regulate the sanitation and conduct in so far as it affects health of schools, hospitals and sanatoria, maternity homes, asylums, orphanages, hotels, restaurants, lodging-houses and tenements, factories, workshops, industrial and labor camps, recreational resorts and camps, barber shops, swimming pools and public baths, places of public amusement, and public conveyances and stations.

"5. Establish, maintain and enforce isolation and quarantine.

"6. Close theaters, schools and all other public places and forbid gatherings of people when necessary for the protection of the public health.

"7. Abate nuisances endangering the public health.

"8. Regulate plumbing, drainage, water supply, sewage and water disposal, lighting, heating, ventilation and sanitation of public buildings, in the interest of public health."

Art. 2 establishes health districts and provides for the appointment of a district health officer and authorizes the establishment of county health departments to cooperate with the district health officer.

Art. 3 relates to the control of nuisances and contagious diseases; provides for vaccination; requires the report of householders as to persons in his family sick with any contagious disease "dangerous to the public health."

Another section of this article provides for the inspection of travelers who might be suspected as bringing with them any infection "which may be dangerous to the public health." Another section gives justices of the peace and judges of the district courts power to restrain the movements of persons infected with contagious or infectious diseases; quarantine of persons for the purpose of preventing the spread of contagious or infectious diseases is provided for. Epidemics are dealt with.

Sec. 71-314 provides: "The State Treasurer shall establish a special fund to be known as the 'Health Protection Fund' which fund is hereby created." Laws of 1931, c. 128.

Sec. 71-315 deals with the objects of the fund and says: "The objects of the Health Protection Fund are to assist the counties of this state to establish and maintain improved health services in the manner herein prescribed; to match such sums as may be offered by the United States Government, public or private organizations or by individuals for the same purpose, and to serve as a depository for the receipt and disbursement of such gifts, subscriptions,

donations, allotments or bequests when so desired by the donor."

By Sec. 71-318 the boards of county commissioners are ordered to levy a special health tax upon all taxable property in their respective counties not to exceed one mill on the dollar of assessed valuation of such property and the proceeds thereof shall be covered into the "county health fund", which fund is thereby created, and to be used only to defray the cost of enforcing all the health laws, rules and regulations as provided by law.

Art. 5 deals with the disposition of the unclaimed dead.

Art. 6 deals with adulterated or unhealthy food or drink which might be injurious to health. Laws of 1889.

It is not necessary to recite further details, but an examination of this chapter entitled "Public Health and Safety" by the publishers with the acquiescence of the compilation commission and this Court gives a fair index to common understanding as to measures which relate to the public health and safety. This service is for all the people regardless of age.

There is another subdivision of our statutes, being Art. 35 of Ch. 41 of the 1941 Statutes Annotated, and this is also entitled "Public Health and Safety" and is directed more to individuals and relates to the maintenance of public nuisances; defining public nuisances such as maintaining unhealthful privies or cesspools; disposing of debris and offensive matter near roads or highways or near inhabited buildings; bathing in or polluting reservoirs or water supplies; regulating slaughter houses; spitting in public places, etc., all obviously touching the public at large.

It is of some significance that the provisions for public assistance in the Public Welfare Act which includes any "service, aid, assistance or relief, whether monetary or otherwise granted to a needy individual" § 73-101, subd. (m), was not placed under the supervision and administration of the Public Health Department but is a separate department dealing with the alleviation of many of the harsh conditions of life without regard to the health of the needy individual and surely without regard to the "public health" as that term is commonly understood.

These conceptions of the public health and existing and anticipated dangers to it as outlined in our public health statutes are in accord with an old and standard definition of the public health. In State v. Becker, 289 Mo. 660, 233 S.W. 641, 649, it was said: "By the 'public health' is meant the wholesome sanitary condition of the community at large. 1 Bl.Com. 122; Anderson's Law Dictionary."

Obviously the provision for old age assistance is one of relief simply and purely. It is none the less meritorious on that account. It is a most worthy cause and one in which I deeply sympathize. It requires no argument for its support as a social service. But it does require a vast deal of argument and stretching of the processes of

reasoning to produce conviction that this sort of social service was in the minds of the constitution makers as a measure to provide for the preservation of the public health or reasonably within the language employed in the constitution.

It is to be noted from the act here in question (the Tobacco Tax Law) that not one dollar of the proceeds derived therefrom can be used for the purposes mentioned in the chapters on "public health and safety" which I have mentioned. The funds are to be used solely for "old age assistance".

A careful analysis of the Public Welfare statute should produce conviction that old age assistance is an outright grant of money and on a different basis from other assistance.

Sec. 73-101, Comp. 1941 (Definitions) (m) says: " 'Public assistance' means any service, aid, assistance or relief, whether monetary or otherwise granted to a needy individual by the State Department of Public Welfare."

Sec. 73-111 says:

"Public assistance shall be granted under this Act * * * to any needy person who:

"(a) Has not sufficient income or other resources to provide a reasonable subsistence compatible with decency and health."

This language is broad enough to embrace any needy person who is 65 years of age or over and to render unnecessary the establishment of old age assistance contained in Sec. 73-122 unless it is based upon something different than general public assistance.

Sec. 14 of the Tobacco Tax law, Laws, 1943, c. 95, says: "All revenues including taxes, penalties, interest and license fees collected under this act shall be paid over to the State Treasurer, and shall be placed by him in a fund to be known as the 'Department of Public Welfare Fund' for old age assistance."

Since a needy person 65 years of age is also within the privileges of Sec. 73-111 and entitled to public assistance accorded to "any needy person," he gets under the definition of "public assistance" contained in paragraph (m) of Sec. 73-101 "any service, aid (and) assistance," which the Department of Public Welfare is authorized to render which I assume includes medical attention and perhaps hospitalization under the provisions of Sec. 73-125.

In a pamphlet issued by the Department of Public Welfare entitled "Questions and Answers" is the following:

"Q. What kinds of services does the Department give in addition to financial assistance?

"A. Services in connection with *health* problems are:

"Provides examination and treatment for persons who are blind or who are in need of eye care.

"Maintains a sanatorium for tuberculosis persons who need institution care.

"Provides for the care and treatment of crippled children.

"Within limits of funds available, provides examinations and treatment for persons who are sick and unable to purchase necessary medical care."

So the key to what might otherwise appear to be a discrimination in allocating all of the tobacco tax to "old age assistance" is probably found in paragraph (f) of 73-101 as follows: "Old age assistance means money payments to aged persons in need."

Counsel for relators say that it stems from the "Townsend Plan" and is an old age pension pure and simple.

The foregoing analysis satisfies me that so far as "old age assistance" is concerned it is not designed to provide for the preservation of the public health. It is something in *addition* to the provisions which have been made to preserve the public health. What reason would there be for creating a new classification of "old age assistance" which means money payments to the aged persons in need unless this kind of relief was something above and beyond and separate and distinct from the kind of service, aid and assistance which could be rendered under the authority of paragraph (m) of Sec. 73-101, and under the "Public Health and Safety" statutes.

The idea of old age pensions or old age assistance has been publicized by Dr. Townsend and the adherents to his plan and we know that it has been a political issue even in New Mexico.

I am not saying that the plan may not be meritorious and it has a lot of supporters.

And it looks to me that the 1937 act, being the Public Welfare Act, adopted the idea and that the legislators may have intended for it to be clear that it was a response to the demand of those who advocated this social service.

These distinctions are substantial and a brief recital of current history supports them.

As we have seen, the case of indigent persons has been a matter of governmental concern from very early times, but the idea of old age pensions or old age assistance is of comparatively recent origin.

In the Michigan Law Review article cited post it is said that during the decade preceding, great strides had been made in enacting such legislation and that five states had adopted "old age pension laws". This has now increased to over twenty. The writer continues: "Despite years of agitation, old age protection legislation has made no headway in the United States until recently. By 1929 forty-eight old age pension bills had been introduced in the federal Congress, but not one had ever been reported out of committee. Before 1923 only a single state had enacted such legislation, and this law was declared unconstitutional before it became operative. However, a period of activity which began following the great war led, in 1923, to the adoption of old age pension laws in three states. Since then such legislation has steadily increased, and today old age pen-

sions are provided for by the laws of seventeen states and Alaska."

The majority say a "pension" is "a periodical allowance or bounty for past services rendered to the public."

Undoubtedly that was the old conception of a pension, but the moderns have tacked onto that theory in justifying the old age pensions or old age assistance or whatever you may call it, based upon the same theory. For instance in an article in Vol. 30, Michigan Law Review for January 1932, at page 403, there is an article on "Old Age Pensions" wherein the idea is developed that the aged have helped to contribute to the prosperity of the commonwealth and they should be taken care of by the society which they have helped to benefit. At page 409 the writer says: "Mr. Epstein, after a careful study of the problem, concluded that 'the underlying cause of old age dependency today lies outside the control of the individual'. The true causes he finds to be: 'industrial superannuation, waning earning power, sickness, industrial accident, unemployment, inadequate wages, industrial disputes and business and banking failures'. Thus, old age dependency is caused by our social and economic order; and the society which has created that order must protect its unfortunate consequences."

I am not saying that is not true nor that it is not a good thing.

What is repulsive to my reasoning powers is an attempt to relate this social service to the narrow proposition that its adoption as a state policy is necessary to the preservation of the public health.

Further references to publications which use the expression "old age pension" and "old age assistance" acts as synonymous will be found in the annotations in 37 A.L.R., page 1524; 86 A.L.R. page 912; and 101 A.L.R., page 1215 under the title "Constitutionality of Old Age Pension or Assistance Acts." An article in Vol. 10 of the American Bar Association Journal (1924, page 109) is on the subject "Old Age Pension Legislation."

It will be noticed in 1941 Comp.Sec. 73-109 the following: "The State Department is hereby designated as the state agency to cooperate with the federal government in the administration of the provisions of title 1, title 4, part 2 and 3 of title 5 and title 10 of the Federal Social Security Act."

Being curious to know what these provisions were, I went to the United States Statutes Vol. 49, Part 1, Public Laws, and find at Ch. 531, page 620, 42 U.S.C.A. § 301 et seq., the law entitled "An Act To provide for the general welfare by establishing a system of Federal old-age benefits, and by enabling the several States to make more adequate provision for aged persons, blind persons, dependent and crippled children, maternal and child welfare, public health, and the administration of their unemployment compensation laws; to establish a Social Security Board; to raise revenue; and for other purposes."

Title 1, 42 U.S.C.A. § 301 et seq., is as follows: "Grants to states for old-age assistance." I notice that a federal requirement in order for the states to receive the federal aid is that the plan devised by the states be to pay money to "aged needy individuals". Just how needy is not stated. Then it is provided:

"The Board (federal board) shall approve any plan which fulfills the conditions specified in subsection (a), except that it shall not approve any plan which imposes, as a condition of eligibility for old-age assistance under the plan—

"(1) An age requirement of more than sixty-five years, except that the plan may impose, effective until January 1, 1940, an age requirement of as much as seventy years; or

"(2) Any residence requirement which excludes any resident of the State who has resided therein five years during the nine years immediately preceding the application for old-age assistance and has resided therein continuously for one year immediately preceding the application; or

"(3) Any citizenship requirement which excludes any citizen of the United States." 42 U.S.C.A. § 302.

In Sec. 3 of title 1 it is said that the money which the federal government pays to the states shall be used "exclusively for old-age assistance" and that the federal government will pay one half of the total sums expended for old age assistance under the state plan. The federal plan does not contemplate the contribution if the payments are more than $30 per month to the aged individuals.

I have information from the Public Welfare Department that "public assistance" is paid for entirely out of state funds, whereas "old age assistance" is paid for 50-50 by the state and federal government.

This may have been the reason for keeping them in separate pigeon holes. That is to say, that public assistance proceeding purely from the standpoint of the indigent ought to be taken care of solely by the state. Whereas old age assistance, as suggested in the Michigan Law Review article, is a social and economic problem caused by the aged becoming worn out in the service of their country and the taking care of such individuals is not only a matter of state concern but primarily of national concern, and proceeds not upon the narrow ground of public health or even of public peace and safety, but as the title to the federal act says, upon the ground of public welfare and as a matter of economic justice.

There is plenty of argument to support the claim that this is wise federal legislation and that it is wise for the states to cooperate with the federal government in furtherance of the plan. All I am saying is that we ought not to deceive ourselves with the idea that this is a public health measure, in the sense employed in the constitution to deprive the people of an opportunity to control this new public policy.

Our public welfare statute did not mention residential requirements as a factor of

eligibility to receive old age assistance, but the Public Welfare Department of New Mexico, sensing the necessity of complying with the Federal Social Security Act above quoted, has promulgated some rules and regulations on "eligibility for assistance and service programs" and among those touching on old age assistance is the following: "The applicant must have lived in New Mexico for at least 5 years within the last 9 years. Also, he must have lived in New Mexico continuously for one year immediately before the date of his application."

This regulation complies with the federal statute and I think it is a very sensible one because in the administration of the Federal old age security legislation when the states are matching federal funds, each state ought to take care of its own aged needy individuals. This helps to protect the fund and avoid persons otherwise eligible from moving around from place to place and state to state to secure the benefits of the more liberal provisions.

These requirements of the 1937 Public Welfare Act are reasonable provisions to protect the funds from imposition. They show that the idea of preservation of the public health was not the paramount consideration if it was any consideration at all because the public health being as important as it is and manifested by the great concern for it in the statutes I have previously quoted, if the legislature thought that everybody ought to have at least $30 a month for subsistence, otherwise they might become a menace to public health, then it would be extremely shortsighted to put in the residential qualifications of at least one year's continuous residence and five years residence out of the last nine years before a person otherwise eligible could receive the pension, dole, assistance, security or whatever you may call it. Because those aged persons within our midst who cannot meet the residence requirements are just as potentially dangerous to the public health as those who do have the residential requirements.

Another significant thing to be noted from the regulations of the Department of Public Welfare is that as to general assistance or "public assistance" defined in Sec. 73-101 quoted supra, there are no residential qualifications of eligibility of the recipients. This bears out my argument that "old age assistance" is based upon some theory distinct from health considerations.

It was said in argument by the Assistant Attorney General that if by the tobacco tax we get more money for the old age assistance fund, some of the monies now used for old age assistance can be employed in other worthy purposes authorized by the Public Welfare Act. Maybe so. But do not the people have the right to say: "Leave it alone like it is."

If the people haven't a right to help shape the state policy by disapproving a policy proposed by the representative legislative assembly, then the legislature of 1945 could say, "Let's use the tobacco tax for something else and have a tax on gaso-

line for the old age assistance fund", and then in 1947 they could say, "Let's use the gasoline tax heretofore used for the needy aged for something else and get a property tax and a poll tax to provide for the needy aged", and so on ad infinitum. And the people could not disapprove because the Supreme Court says it relates to the preservation of the public health and therefore the people cannot have a referendum.

To emphasize my argument let me call attention to Secs. 12 and 13 of Art. 9 of the Constitution. Sec. 13 puts a limit on the debt contracting powers of municipalities. But it says that such municipalities may contract debts in excess of such limitation for the construction or purchase of a system for supplying water or for a sewer system for such city, town or village. I agree with the majority that no one would doubt that this is a recognition of the importance of a system for supplying water or of a sewer system to the public health, and so the limitations are taken off. We know as a practical thing that the only way cities and towns build sewer systems and water works of any considerable magnitude is by contracting debts for that purpose, and yet by Sec. 12 of Art. 9 it is said that no such debt shall be contracted unless the question of incurring the same shall, at a regular election, etc., have been submitted to a vote of such qualified electors thereof as have paid a property tax therein during the preceding year and a majority of those voting on the question shall have voted in favor of creating such debt.

My point is that the constitution manifests some concern for the taxpayer and that it should not be regarded as a matter of reproach to the taxpayers that they may wish to have an opportunity to say to the 1943 legislature: "We are not objecting to your old age pension or old age assistance legislation. You are already getting large sums from the liquor licenses, from the franchise tax, from the compensation tax, from the severance tax, and the counties and cities and towns can levy a half mill tax on all taxable property. In addition to this you get large sums from the federal government. You can also probably get some additional sums from the State Finance Board out of funds under its control. Aged needy individuals are afforded medical assistance the same as other needy individuals under this and other laws. What we petitioners want is the opportunity to give the people a chance to say whether they are satisfied with the way the social security program is working under the present setup or whether this new tax will be imposed in order to give the State Welfare Board an opportunity to rebudget the fund now available."

In other words, the disapproval of the Tobacco Tax Law would not repeal the public welfare act nor any of the laws heretofore enacted providing funds for its administration and for old age assistance.

To say that the expression of opinion in the preamble to the act that with more money the Welfare Department could do a better job for the relief of aged needy in-

dividuals is the expression of an opinion that if more money is not secured by the adoption of the tobacco tax, the public health will be imperiled requires considerable mental gymnastics.

All authorities agree that the words of the constitution must be given their plain and ordinary meaning. The plain and ordinary meaning of the phrase "public health" is that which affects the health of the community at large.

But this is not all. The narrower question is: What perils to the public health do the needy aged present at the present time which have not been adequately provided for heretofore?

That the care and maintenance of indigent persons has long been a state policy is apparent from Ch. 8 of the Session Laws of 1913 (Art. 2, Ch. 73, N.M.S.A.1941). It was there provided: "That Boards of County Commissioners of the several counties and the council or other governing board of incorporated cities, towns and villages in the state are hereby authorized and empowered to make such provision as they may deem proper for the relief of deserving indigent persons who are objects of charity, residing within their respective limits." To this was added by the 1939 legislature in Ch. 189 the words: "and who have resided within the State of New Mexico for more than one year." This addition is principally significant as showing that the law is still in force, and recognized by the legislature as a power existing in counties and municipalities to take care of the situation

of those who are indigent. Section 2 of the Act of 1913 provides: "That in order to provide funds for the purpose of this act, such boards of county commissioners and such counsel or other governing boards are hereby respectively empowered to levy and collect annually in the same manner as other taxes are levied and collected a tax of not to exceed one-half of one mill upon all taxable property within the limits of such counties and municipalities." That section was amended by the Laws of 1941, Ch. 122, so as to provide that the boards of county commissioners or governing bodies or the council of any city, town or village is authorized to enter into a contract with the Public Welfare Department of the State of New Mexico for the care of indigent persons residing within the limits of our respective counties or municipalities and to pay over to such Department of Public Welfare the indigent fund of their respective county or municipality within the limits of such indigent fund provided for the fiscal year as such funds may be available. It is then provided that if for any reason the Department of Public Welfare has not expended the entire amount which has been turned over to said department by any board, any remaining balance at the end of the fiscal year shall be refunded to the source from which it was received and by same board deposited to the credit of the indigent fund of such county or municipality. This shows that in 1941 the legislators thought that it was possible that the indigent fund of counties and municipalities, raised within the limits of the

one half mill levy would be more than enough to take care of indigent persons in such counties and municipalities.

Then came the Public Welfare Act of 1937, found in Ch. 18 of the Session Laws of that year, which was rather broad in its scope and supplemented to some extent the purposes and objects of the 1913 act. Of course the Public Welfare Act covers a number of activities besides rendering assistance to the needy aged.

I am advised that in 1942 the liquor licenses brought in in round numbers $1,000,000; the franchise tax $200,000; the compensating tax $360,000; the severance tax $371,000; and this was all in addition to federal aid, the figures on which I do not have, but which was a substantially large amount.

Now let us look at the amount which *could* be raised by the counties and municipalities under the 1913 law. The amount of the taxable property of the state is $351,-582,298. If I have my figures right a one-half mill levy upon this amount of taxable property would be $175,791. There is nothing in the record to show that this source of revenue has been exhausted. I am informed that every county in the state makes some sort of levy for the purpose of taking care of indigent persons and that in 1942 the total levy in the state for this purpose was $64,945. It thus appears that provision has already been made for caring for indigent persons, which of course would include the aged.

Of course I am not contending by this argument that we have a right to judge as to the wisdom of a proposed legislative means for accomplishing an old purpose accomplished in some other way.

What I am contending for is that the fact that only about one third of the resources available to counties and municipalities has been drawn upon is strong and almost conclusive evidence that there were no perils existing which threatened the public health from the condition of indigent persons. Boards of county commissioners and governing bodies of municipalities might be callous to the needs of indigent persons but it does not seem likely that they would be indifferent to threats of injuries to the public health and if any such perils existed the untapped resources would have been drawn upon.

In State v. Becker, supra, the Court said: "The word 'preservation', say the lexicographers, presupposes a real or existing danger." The very fact that a substantial source of revenue from a one-half mill levy on the taxable property of the state which has not been exhausted and which has been tapped to only one third thereof is a strong indication that in the minds of the boards of county commissioners and the governing bodies of municipalities there was no existing danger.

To say that about 1% of our citizens, widely distributed, living in pastoral conditions, surrounded by people of proverbially hospitable and kindly natures, already the recipients of "public assistance" and

"old age assistance" from the state, further protected if need be by the unexhausted power of county commissioners and governing bodies of municipalities, further to be served if they become in distress by sickness through the instrumentalities of local district and state health agencies provided for by separate laws heretofore mentioned, will, but for the tobacco tax be a menace to public health is too much of a strain upon reason and common sense.

By Sec. 73-103 the Department of Public Welfare is authorized to receive and disburse funds, commodities, equipment, supplies and property of every kind, given, granted, loaned or advanced for old age and other public assistance. The Public Health Act heretofore mentioned contains a similar provision for the receipt and disbursement of donations from public minded citizens.

We know that in times of peril multitudes of our citizens, without the coercive measures of taxation, lend their efforts to avert such perils. I cannot conclude that the churches, the benevolent societies, the members of families, friends and neighbors of the needy aged have suddenly become so callous that they would be so indifferent to the privations of these unfortunates that they would permit them to become a menace to our public health and safety.

That which all know, the courts must judicially know. Current history shows the real purpose of this and similar laws, and we need not further state the history. It is known to every member of the representative assembly, every judicial officer of the state, every lawyer and citizen who has read and kept abreast of the current history made and now being made. To say that the purpose of the tobacco tax bill is to protect New Mexico in some great impending perilous condition relative to the public health is not only in the face of the bill itself but in the face of what her citizens know.

We cannot shut our minds to the fact that the act in question is a *relief measure,* and to the fact that direct relief from the public funds is a social and political question concerning which the opinions of our citizens are in sharp conflict. Some profess to fear paternalism as a factor in government; that there are dangers ahead if a bloc of voters on relief may exercise a large influence in elections, notwithstanding such restraints as the Hatch Act may afford (see News Week, July 3, 1939).

Others think it is a problem which should be solved by the church, benevolent associations and individuals. To the contrary, there is a large contingent who believe that it is a proper function of government to provide for the needy who have no other means of subsistence.

I see no occasion to be ashamed of it for what it is as an independent policy.

In 1940 Fortune conducted a poll on the question: "Do You Think the Government Should Provide for All People Who Have

No Other Means of Obtaining a Living?" The answers were:

"Yes          65.1%
"No           27.8
"Don't Know    7.1"

(See March issue, 1940.)

That the statute involved in the case at bar is designed to serve a humanitarian purpose may not be doubted. That this is sufficient reason for the law is perhaps the view of a majority of our people.

The referendum also is designed for the preservation of public peace and safety. The right of the people through their representatives in the legislature and by supervisory control over their acts to control the course of legislation is one of the fundamentals of our state government and should not be impaired.

Sec. 2 of Art. 2 of our constitution says: "All political power is vested in and derived from the people; all government of right originates with the people, is founded upon their will and is instituted solely for their good."

This declaration but emphasizes Sec. 1 of Art. 4 here directly involved and aids in imputing to the constitution makers an intelligent and honest · purpose and refutes the insinuation that this body of men were guilty of a questionable purpose of having yielded to a demand of the people for a referendum, but at the same time putting in a joker so as to render such referendum clause impotent, inert and of no effect.

In the solution of our immediate problem, much depends on our approach to it. If we start out with the premise that the power reserved to the people to veto laws enacted by the legislature is of high importance and dignity and itself tends to promote the public peace and safety, we will lean toward a construction which will guard, preserve and protect it from nullification or encroachment. If on the other hand it is thought that this reserved power of the people to veto laws enacted by the legislature is of small importance, conceived in trickery, we will more readily discover that a law enacted by the legislature provides for the preservation of the public peace, health or safety and is consequently immune from referendum.

My mental attitude and approach to the problem is not new born and aligns me in favor of the referendum power of the people and repels any encroachment thereon through fine spun arguments. My views were emphasized in my opinions in Todd v. Tierney, 38 N.M. 15, 27 P.2d 991, decided 10 years ago, and Hutcheson v. Gonzales, 41 N.M. 474, 71 P.2d 140, decided 6 years ago.

It is a cardinal rule of construction of statutes and constitutions that the enacting part thereof must be liberally construed, and exceptions must be strictly construed.

Here referendum is the rule and a particular statute said by some to provide for the preservation of the public peace, health or safety is the exception and the burden

is upon him who asserts that the act is not referable, to show that it clearly and obviously so provides.

We are not called upon to strive by labored argument to deny the right of the people to vote upon it.

The public health is not even mentioned in the act under consideration as it was generally mentioned in our statutes heretofore cited, and which would obviously refer to the public health.

Add to the foregoing the fact commonly known that the representative legislative assembly several times during the 1943 session were urged to attach the emergency clause because it was thought by some that attaching such a clause would except the act from a referendum. After due deliberation the act was passed without the emergency clause. We have a right to assume that it was the opinion of that body that the public peace, health and safety was not imperiled and rather evinces an expression of a desire that the people decide the question of policy.

A brief reference to some faulty arguments of the majority may not be amiss. They say: "If the issue were doubtful it would be our duty to resolve it in favor of the legislative determination and constitutionality." That might be the rule when an act is under attack as being unconstitutional, which is not the case here. On the issue before us all doubts ought to be resolved in favor of the right of the people to exercise their power of referendum. They are as capable as their representative legislators to judge as to what is wise, expedient or necessary.

The majority say: "It is not our province to declare the Legislature acted unwisely." That is correct so far as we as judges are concerned. But the province to declare whether "the Legislature acted unwisely" is exactly what the constitution does reserve to the people as electors. They say: "After all it was for the Legislature to appraise the danger apprehended and move to meet it." This deference to the surplusage of opinion recital of the representative assembly contained in a preamble makes of the constitutional referendum a mere scrap of useless paper. In State v. Becker, supra, it was said: "Legislatures, like courts, sometimes err. The referendum has been thought designed to correct legislative errors. If respondent's position is tenable, then, if the legislative assembly shall err and pass a bad law (in the belief that it is a good law), the error in passing this bad law is not subject to the referendum, but is exempt from such correction upon condition only that the same legislative assembly shall commit one more error—i. e., find as a fact that the law is necessary for the immediate preservation of the public peace, health, or safety, and then put this erroneous finding into the bad law. Does one error plus one error equal no error for the purposes of this case? To ascribe such an intent to the people is to charge them with incorporating a remarkable absurdity in the organic law of the state. If the people desired that the same body whose enactments they

wished to supervise by means of the referendum should have full power to prevent such supervision in every .case, it seems reasonable to think they would have said so, and, particularly, would not have avoided so carefully a form of words already in the Constitution which would have been adequate to have effectuated this remarkable purpose."

If I were in doubt I would rather make a mistake in favor of the referendum than against it. State policy as expressed in legislative enactments may change, and if the referendum is conducted the people will probably decide correctly. It is better that they have the opportunity to do so even in a doubtful case than that the power of referendum be whittled down by court decisions, until eventually no one would ever know in advance with any certainty when the people may have a referendum. This is but another way of stating the rule of construction that reservations of power in the people should be liberally construed to sustain and perpetuate the power, whereas exceptions should be strictly construed.

The majority cite Los Angeles County v. La Fuente as being the only case which research discloses as declaring itself on the direct question of the relationship of old age assistance to public health. That was a case involving the constitutionality of a statute and of course the court was correct in applying the rule of construction as to the constitutionality of a statute and saying [20 Cal.2d 870, 129 P.2d 378, 381]: "Whether it is wise to give benefits to one who has a child willing and able to support him is a question for the attention of the Legislature and not for the courts."

The argument was that since the care and relief of aged persons who are in need "may" be a special matter of state concern in promoting public health and welfare, the act should be permitted to stand against an attack upon its constitutionality. In the case at bar a different rule applies because the people being a part of the legislative processes and having the power to disapprove a law enacted by the legislative assembly, the question of whether the legislation is wise is for the attention of the people as well as for the assembly.

The same objection may be made as to the decisions cited by the majority upholding legislation against objections, that they are not within the police power of the states. It was appropriate in those cases to indulge every presumption in support of the law as against such an attack. The difference is that in the case at bar the law is not under attack as being unconstitutional. The petitioners for a referendum merely say that they desire an expression of the voters not as to whether it is wise to care for the indigent, but whether the tobacco tax is necessary for that purpose.

To my mind there is greater danger to the public peace, health and safety in having large groups of our citizens disheartened with the sense of frustration arising from withdrawal from them of the right of petition and referendum than there is in the remote danger to the public health by a possible rejection of the tobacco tax.

To reject the tobacco tax law would not leave the welfare board and other agencies powerless to relieve the needy aged in view of the many resources already at hand.

The provision for referendum is one of the constitutional processes which is ordained and established for the maintenance of a democratic form of government. I cannot acquiesce in the annulment or impairment of it by means of strained and unsatisfactory argument and reasoning, therefore I dissent.