## City of Princeton v. Poole, et al.

(Decided December 15, 1922.)

### Appeal from Caldwell Circuit Court.

1. Municipal Corporations—Injunctions.—A municipality is entitled to injunctive relief against persons erecting buildings and other improvements upon or over its streets, passways or other public places within its limits.

2. Municipal Corporations—Streets—Adverse Possession.—Where a city shows by its records, including the acts of the legislature creating and establishing the municipality and by maps, that certain streets, alleys and public grounds once belonged to the city, and the defendant relies upon adverse possession, the burden is upon the adverse claimant to show not only that he had been in the actual adverse possession of the property in controversy for as much as the statutory period but that he had given to the city written notice as provided in section 2546 Kentucky Statutes that he intended to hold such property adversely.

3. Municipal Corporations—Sale or Release of Streets.—A city and its board of council have no inherent power to sell, give or release any of its streets, alleys or public ways, and when such authority is conferred by statutes its exercise must be in accordance with the terms of the statutes.

R. W. LISANBY for appellant.

ABERT MORSE and JOHN G. MILLER for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

By this action the city of Princeton is attempting to recover of appellee Poole and his assignee the sum of two thousand ($2,000.00) dollars, and by injunction to compel the said Poole and his assignee to remove a certain rock or concrete wall erected by Poole under a store building which extends out into a creek running from what is known as the Big Spring in that city, and from maintaining such a wall as will throw the water out of its channel on to a part of the city's property and especially its streets, and to remove all buildings and

structures owned by him from the public ways of the city, especially to remove that part of his structure which is built upon and along the edge of Big Spring alley, and to remove a certain sleeping porch built on the front of his store building and which sleeping porch projects over Main street, and to enjoin and restrain Poole and his assignee from all acts of trespass on the city's property, and to compel him to remove his structures from said public ways and streets. Appellee Poole and his assignee deny that they or either of them have encroached upon the lands or streets or ways of the city, and deny that the city or the public have a right to the stream running from the Big Spring, and deny that the city has any title or right to any of the property over which the building in question now stands. A trial resulted in a judgment dismissing plaintiff's petition and refusing the city the relief prayed, from which judgment the city has prosecuted this appeal.

It is admitted by Poole and his assignee that the sleeping porch over the street and on the front of the store building is a trespass upon the city's highway, but they insist that the sleeping porch was constructed under a permit from the city given by its treasurer and other officials, and further that the city officials stood silently by and allowed Poole to erect the said sleeping porch without objection and they pleaded these things in estoppel against the city to have the said sleeping porch now removed. The Poole building is erected upon a lot which faces 66 feet and 6 inches on the east side of Main street and runs back from Main street towards Big Spring branch. It is described as beginning at the intersection of Big Spring alley and the south side of Main street; thence running North 66½ feet; thence at right angles with main street 145 feet to the edge of the Big Spring branch; thence with Big Spring branch — feet; thence a western course 49 feet; thence a southern course 30 feet and six inches to Big Spring alley; thence with the east side of Big Spring alley to the beginning. This description does not include a plot of ground 30 feet and 6 inches wide and 49 feet long at its greatest length which adjoins the creek from the Big Spring and lies just below the Big Spring, nor does it include a strip of ground beginning at the west edge of the creek and being at that point about four or five feet wide and extending up the alley with the building some 50 or 60 feet to a point, over all of which Poole and his successor now have a building out on

the alley; nor does the said description include any part of the creek which is now enclosed by the foundations of the building.

The city of Princeton was laid out about the year 1816, and on February 3, 1817, a surveyor designated by public authority divided up a fifty-acre tract of land donated to the city of Princeton as a county seat, into sixty-five building lots with streets and alleys running through and across the plot of ground. One square of this town plot was designated as the public square on which to build a courthouse and other public buildings, and is located about one-half a block northwest of the Big Spring. From this square Main street runs north, and the Big Spring comes from under a cliff on public ground just back of lots 1 and 4. No doubt the town was located on that tract because of the big spring and the cave spring which are just above it, and the other good springs in that locality. In the year 1846 another donation of land was made by individuals to the city, and this tract covered all the spring property and a great deal of land west and south of the spring. This tract was likewise laid off into city lots with streets and alleys between. At that time it was customary for our legislative body by act to locate the county seats and provide for raising money to build the courthouse and other public buildings and to attend to the fiscal affairs of the counties until fully organized. Pursuing this course the legislature some time previous to February 3, 1817, passed an act which was approved on the aforesaid date, providing that "Whereas it is represented to the general assembly, that a contrariety of opinion has prevailed in the county of Caldwell respecting their seat of justice, to the manifest injury of the citizens of said county; in order to quiet the same, therefore, BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF KENTUCKY, that Walter Jones, Samuel H. Curd, Washington W. Whitaker, James Wilson and Wiley Barner, of Logan county, be, and they are hereby appointed commissioners, who or a majority of them, are to meet at Eddyville, in the county of Caldwell, on the 10th day of May, next, or so soon thereafter as may be practicable, and shall thence proceed to Prince's place at the head of Eddy creek; they shall then conclude and decide which of the two places, Eddyville or the place of Prince and Frazier, known by the name of Prince's place, shall be the seat of Justice for the said county, after duly considering the

conveniences, advantages and disadvantages, benefits and injuries, that may and will result to all the citizens of the said county in consequence thereof; also the future harmony and peace of the inhabitants of said county, together with the donations that may be proffered; and the said commissioners, a majority of them concurring, having fixed on one of the two places before mentioned for the permanent seat of justice in said county, shall certify the same to the justices hereafter mentioned; also to the county court for said county, which certificate to the court shall be filed with the clerk, and by him laid before the next succeeding court for said county.''

By another section it is provided:

''That should the commissioners fix on the lands of Prince and Frazier, for the seat of justice of said county, Samuel Smith, Edward Robertson, William Birdsong, Stephen C. Davis and Dawson Williamson are hereby appointed trustees, whose duty it shall be to lay off a town at the place fixed on by the commissioners on the land of Prince and Frazier, and set apart such a portion of land as may be necessary for public uses, and proceed to lay off the residue of fifty acres of land to be given by Prince and Frazier, as a donation to the county, into lots, streets and alleys, and sell the said lots at public auction for the best prices that can be had for them, on such terms of payment and in such proportions as they may deem most advantageous to the county, giving public notice of the terms and time of such sale.''

By another section it is provided:

''Be it further enacted, that the justices of the county court of Caldwell shall appropriate the money arising from the sale of the lots of lands donated to the county by Prince and Frazier, together with other donations that may be made the county, or so much thereof as may be necessary to complete the public buildings, provided the commissioner remove the seat of justice of said county.''

Another bill passed by the legislature, approved December 6, 1820, reads:

''That the town laid off on the lands of Prince and Frazier in Caldwell county, agreeably to an act of assembly, approved February 3, 1817, and called 'Princeton,' be and the same is hereby established, and all the land which was donated to the county court of Caldwell by the proprietors thereof, and vested in Rueben Rowland, Thomas Frazier, Thomas Champion, Morton A.

Rucker and John H. Phelps, gentlemen, trustees for said town and their successors, in office, or a majority of them, are hereby empowered to convey by deed any lot or lots to the purchasers, agreeably to the plan of the town of record in the office of the county court of Caldwell.''

Again on December 6, 1821, an act of the General Assembly was approved whereby a further addition was made to the town of Princeton in the county of Caldwell from the lands of Frazier and Prince, as follows, to-wit:

''Beginning at the corner of the lot which includes the stone house where William Prince, Sr., formerly lived, adjoining the town of Princton where the main cross street crosses Main south street; thence North 70 west 109 poles five and one-half feet; thence south 20 west 73 poles 5 feet; thence south 70 east 122 poles; thence north 20 east 55 poles and 8 and one-half feet; thence north 70 west 212 feet; thence north 20 east 264 feet to the beginning. Likewise the further addition: from the lands of Lewis McLaughlin and Frazier, beginning at the southwest corner of the 50-acre donation as made by Prince and Frazier to the county court of Caldwell county; running thence north 20 east 981 feet; thence north 70 west 1,592 feet; thence south 20 west 981 feet; thence south 70 east 1,592 feet to the beginning, shall be, as above added to the said town of Princeton and the title thereof vested in the trustees of said town and their successors in office; and the said trustees, to all intents and purposes, shall have the full and ample power to make deeds for the same, to any purchaser or purchasers or his or their assigns as they have had heretofore to any other part of said town.''

The grants mentioned in this case and shown upon the maps recorded in the office of the clerk of Caldwell county, copies of which are made a part of the record and admitted to be correct, prove that the title to the land around the Big Spring and covering the streets and passways now in controversy were anciently vested in the city of Princeton and there is no evidence whatever in the record that the city of Princeton has conveyed any of its streets, passways or public grounds and no claim is made, so far as we are able to find, that the city has made any such conveyances. In those early days the Big Spring was one of the most frequented places about the city of Princeton. It was near the courthouse and the public who gathered there for court and other purposes used

the water from the Big Spring for all purposes, besides that, many of the citizens used the water for domestic purposes. It was the watering place for horses and cattle and other stock that came into town; on public days it was used greatly by those who rode horseback into the village. By its constant use the bed of the stream from the spring was considerably widened and deepened so that wagons drove into the creek to be washed and cleaned, and the water was made use of by the public in many other ways. At that time the alley now in question was a frequented passway, so also was Washington street, which ran down from the courthouse towards the spring. The plot of ground around the spring was then and is now the property of the city as appears from the record; so also is the creek bed and pool below the spring. Neither Poole nor his assignee lay any claim by paper title to the back end of the alley next to the creek that runs out of the spring, in so far as the building projects over the edge of the creek into the pool, except by possession, and this for a very limited time; nor do they claim the small plot of ground shown on the map as being adjoining the stream, and running up 49 feet towards the Poole building, thence 30 feet and six inches to the alley; thence east with the alley to the creek; thence with the edge of the creek to the beginning. This property also belongs to the city and has been used for a good many years for public purposes. Part of the time it was a passway, a hitching lot, a walkway and means of driving teams in and out of the pool, and by the public in general for washing. The Big Spring alley was used from the foundation of the city up to a short time before the bringing of this action as a highway to the big spring, and the pool and many people passed that way. It is only in recent years that the building of Poole and his assignee has been broadened and extended on to the said alleyway, and so also has it been but recently that Poole extended his shed and building out into the pool at the rear of his house and erected the concrete foundation which forced the water out of its channel and caused it to cut across the bottom land and tear up Washington street. All of these things were trespasses upon the city's rights. With respect to the sleeping porch in front of the building, it is shown that Poole obtained from certain officials of the city a permit to erect a porch and then a sleeping porch. From the evidence we learn that many such porches have been

authorized by the city and are now in use although they stand out over the walkway and street to some extent. In a way the municipality attempted to make the owners of such porches temporary licensees. All this was unlawful and *ultra vires*: 28 Cyc., pp. 893, 894 and 896; 19 R. C. L. 785; 37 Cyc. 180; 27 C. J. 517; 104 A. S. R. 156; 13 R. C. L. 67. A city and its board of council have no inherent power to sell, give or release any of its streets, alleys, or public ways, and when such authority is conferred on the municipality by statute its enforcement must be strictly according to the statutes. 3562 Kentucky Statutes. It is shown that this particular sleeping porch in front of the Poole building is a shed and a protection against the weather; that it is so high that it does not interfere with the passage of any person or vehicle traveling the streets.

All these facts considered we do not feel that the city of Princeton is entitled to a mandatory injunction against Poole or his assignee to remove this sleeping porch; but in case it should be destroyed by fire or otherwise it will be a matter with which the city authorities may deal.

A rule entirely opposite to the above must be applied the the Big Spring alley and to the plot of ground at the end of the Poole building and to the pool into which the concrete foundation is extended and which the sheds rest upon. It is admitted by Poole and his assignee that no written notice was given by him or them to the city or its officials, as provided by section 2546, Kentucky Statutes, whereby the city was required to take notice that Poole or his vendee was then and thereafter adversely claiming and holding that part of the alley, street, pool and plot of ground to which they now assert right, or more properly speaking, to which they declare the city has been unable to establish title in itself. As the several trespasses committed by Poole and his assignee have been a gradual growth, and it appearing that there is no immediate imperative necessity for the removal of the structures from the alley or the pool or plot of ground, the chancellor should, after hearing the evidence, give to Poole and his assignee a reasonable time in which to perform this work, its nature and object considered, and for the purpose of ascertaining these facts the chancellor may hear evidence.

Wherefore, the judgment is reversed for proceedings not inconsistent with this opinion.

Judgment reversed.