315 P.2d 839

A. L. FARNSWORTH, Clara Farnsworth, C. E. Hinkle, R. R. Hinkle, Forest Levers, E. Clyde Blackwell, Paul Carrigan, Steve Metarlis, M. G. Adams, W. C. Salomon, Grant Keyes, Trustee for Garst Estate; Ray Platt, Arvil Johnson, Claude Forster, M. H. Jacks, J. C. Rogers, Frank H. Graham, Jabe Worsham, Herbert Burton, James M. Dowaliby, E. P. Herring, Norton Kessell and Frank Graham, Plaintiffs-Appellants,

v.

The CITY OF ROSWELL, a municipal corporation, Ralph Jones, T. J. Heimann, Eber McKineey, George LaVendar and G. B. Hatfield, Defendants-Appellees.

No. 6177.

Supreme Court of New Mexico.

June 25, 1957.

Rehearing Denied Sept. 27, 1957.

C. R. Brice, Clarence E. Hinkle, Roswell, for appellants.

James B. Stapp, Roswell, Jack L. Love, Lovington, for appellees.

SADLER, Justice.

The plaintiffs who are appellants before this Court, consisting of property owners and tenants occupying the premises of such owners located on Second Street in the City of Roswell, New Mexico, between Richardson and Railroad avenues, complain before us of the action of the district court of Chaves County in denying them relief by injunction against enforcement of ordinance No. 706 of said City, prohibiting parking of vehicles on Second Street within the area bounded by the avenues above mentioned.

The cause was tried on issues formed by a supplemental complaint filed by plaintiffs instituted, as alleged therein, by the plaintiffs for themselves and in behalf of all persons similarly situated and an answer filed thereto by and on behalf of the City of Roswell, a municipal corporation, as defendant. The state highway commission and the several members forming the personnel thereof were joined as defendants but later dismissed from the case. The chief issue in the trial was the validity of municipal ordinance No. 706, enacted by the City following the execution of a cooperative agreement between it and the state highway department, relative to the widen-

ing and paving of a certain portion of a state highway traversing the City, to-wit, that section of Second Street lying between Richardson and Railroad avenues.

The ordinance in question, among other things, prohibited parking of vehicles on the three blocks mentioned and it is the no parking regulation in the ordinance that forms the gravamen of the complaint made by plaintiffs constituting, as it does, according to the plaintiff's objection, a bartering away by the City of its police power. If the plaintiffs be wrong in their contention that the ordinance is utterly void for the reason mentioned, then the trial court correctly denied the injunctive relief prayed for. The cause was tried before the court which made its findings of fact and conclusions of law, a summary of which will be stated preliminary to a discussion of the basic legal question involved. The plaintiffs are twelve owners of business properties on the three blocks mentioned and twelve who are occupants, each as a tenant, of one or more of said premises.

On February 11, 1953, the City entered into an agreement with the State of New Mexico, acting by and through its state highway commission, for the widening and paving of a portion of U. S. highway No. 380 for a distance of three blocks within the corporate limits of the City of Roswell. Briefly, the State acting through its highway commission agreed to participate in the cost of such improvement to the extent of

one hundred per cent for resurfacing the existing paving; also, to the extent of one-third in the cost of the widening.

Thereafter, on July 15, 1953, the same parties entered into what was called a supplemental agreement, reaffirming the original agreement except as provided in the supplemental agreement. One of the provisos was to extend the work on Second Street to include "that portion between Richardson Street through Railroad Property." Another proviso limited maximum participation by the State to $175,892.51.

Subsequently, on August 27, 1953, the same parties entered into what was called a second supplemental agreement in regard to the same matters. Since it is the covenants undertaken by the City in this second supplemental contract upon which the plaintiffs, both below and as appellants here, level their strongest and most serious attacks, we shall incorporate herein that portion of the second and last supplemental contract, as follows:

"2. For and in consideration of the above covenant the 'City' agrees:

"(a) That it will not permit parking in, along, or upon said street or highway except as permitted by written authorization from the State.

"(b) That no advertising signs, or signboards or devices will be permitted within the right of way of said street or highway, and that no directional, minimum speed or traffic control signs will be placed in said right of way or adjacent thereto without the consent and approval of the State.

"(c) That no removal, excavation, undermining, or change, or damage will be permitted in said highway or street without the express permission in writing from the State, and in event the same is permitted, the City will guarantee to replace, fill or repair, said street or highway to its original condition. It is understood that the State will permit no such removal, excavation or undermining by public utilities or other persons without the consent of the City. * * *"

In due course, thereafter, to be exact on the 9th day of August, 1955, the City enacted ordinance No. 706, reading as follows:

"Ordinance No. 706.

"An ordinance prohibiting the parking of vehicles at all times on certain streets, or parts thereof, declaring certain defined areas to be congested areas by reason of width of the street and heavy traffic thereon and, providing penalties for the violation of this ordinance upon conviction.

"Whereas, Second Street within the City of Roswell is a designated Arterial Highway, and

"Whereas, by reason of the fact that Second Street West of Richardson Avenue has a right of way for vehicles Fifty-Two (52) feet in width and that from the

confluence of said street, commencing at Richardson Aveune Easterly to the Atchison, Topeka and Santa Fe Railway Company right of way tracks, the right of way for vehicles upon said street is Forty-six (46) feet in width and further, by reason of such decreased width and the heavy volume of two-way traffic in four lanes thereon, the area along said street from Richardson Avenue easterly to the Atchison, Topeka and Santa Fe Railway Company right of way tracks is hereby declared to be a congested area, and, Whereas, it is hereby declared to be in the best interests of the safety and general welfare of the inhabitants of the City of Roswell to prohibit the parking of vehicles within such congested area as hereinabove set forth.

· "Whereas, the City Council of the City of Roswell has heretofore by its Motion of 8 August 1953·voted to eliminate the parking of vehicles within the said area and that it is deemed desirable and expedient to enact this Ordinance prohibiting the parking of vehicles within the area hereinabove set forth.

"Now, Therefore, Be It Ordained By The City Council Of The City Of Roswell, New Mexico:

"1. That when signs are erected giving notice thereof, no person shall at any time park a vehicle upon Second Street within the City of Roswell in the area bounded on the West by Richardson Avenue and on the east by the Atchison, Topeka and Santa Fe Railway Company right of way tracks.

"2. That every person who is convicted of a violation of this Ordinance shall be punished as provided in Section 4, Chapter 1 of the Code of the City of Roswell, New Mexico, 1952.

"3. That this Ordinance is hereby declared to be an emergency measure on the ground of urgent public need, and therefore, upon its final passage and approval, shall be recorded in the Book of Ordinances of said City kept for that purpose, authenticated by the signatures of the Mayor and the City Clerk, shall be published as provided by law, and shall be in full force and effect five (5) days after such publication.

"Passed, Adopted and Approved this 9th day of August, 1955.

"/s/ Bert Ballard
"Bert Ballard, Mayor.

"(Seal)
"Attest:
"/s/ H. B. Naylor
"H. B. Naylor, City Clerk."

The remaining findings and the conclusions of law, being brief, are set out herein, as follows:

"6. That since the passage of said ordinance the City of Roswell has enforced the same and has prevented all persons from parking on Second Street between Richardson and Railroad Avenues thereof.

200

"7. One of the purposes of the Defendant City in passing said ordinance was to carry out the purported supplementary contract No. 2 between defendant City and the State by its Highway Commission.

"8. That the following named plaintiffs each owned business property facing Second Street between Richardson and Railroad Avenues in the City of Roswell at the time said Ordinance No. 706 was passed by the defendant City, and owned the same at the time this case was tried, to-wit: R. R. Hinkle, E. Clyde Blackwell and Steve Metarlis.

"9. That the following named plaintiffs each had a business which he operated at the time said Ordinance No. 706 was passed, and at the time this case was tried, which businesses were located in buildings facing Second Street between Richardson and Railroad Avenues in the City of Roswell, to-wit: Ray Platt, J. C. Rogers, F. A. Graham, Jake Worsham and Frank Graham.

"10. That the vehicular right of way from Richardson Avenue to the A. T. & S. F. right of way tracks is 46 feet in width and that there are four lanes of traffic contained therein.

"11. That said three block area in question is a congested area by reason of vehicular traffic from feeder and intersecting arterials, some of which are designated as State highways.

"12. That permitted parking within the three block area in question would tend to obstruct the normal flow of existing traffic thereon by reason of traffic flow contributed from feeder arterials together with the narrow width of said right of way within the area in question.

"13. That a traffic congestion problem exists within the area in question and that there is room for a fair difference of opinion as to the best way to cope with the problem.

"Based upon the foregoing Findings of Fact the Court makes the following

"CONCLUSIONS OF LAW

"1. That the action of the City Council of the City of Roswell in prohibiting parking within the area in question is not unreasonable.

"2. That the City of Roswell has power to prohibit or place a ban upon the parking of vehicles upon public streets within its corporate limits.

"3. That Plaintiffs have no vested private property right herein which is entitled to protection by injunctive relief.

"4. That the losses of these Plaintiffs as shown by the evidence are not such irreparable injury as entitled them to injunctive relief.

"5. That the action of the City Council of the City of Roswell herein is a reasonable exercise of the police power delegated

to it and with which the Court will not interfere.

"6. That Plaintiffs have a complete, speedy and adequate remedy at law.

"7. That judgment herein should be entered for Defendant, City of Roswell, and that all costs should be assessed against the Plaintiffs.

"All Requested Findings of Fact and Conclusions of Law inconsistent herewith are hereby refused.

"To all of which the parties are allowed an exception.

"The parties are given ten days within which to file their formal exceptions.

"/s/ Geo. T. Harris
"District Judge."

While lengthy briefs have been filed, presenting arguments on the main as well as numerous ancillary issues suggesting themselves, when everything is said and done, the record before us presents a single serious question for our determination, namely: Has the City of Roswell by the contract in question bartered away the exercise of its police power in imposing by the ordinance mentioned a no parking regulation on Second Street for the three blocks involved? If it has, of course, the plaintiffs are right and the trial court was wrong in the judgment it entered denying injunctive relief.

Counsel for the plaintiffs do not question the power of the City to regulate parking, even to the extent of prohibiting it in a proper case. In their reply brief, they say:

"If the City's police power had not been bargained away, (and so far as we can learn, they have complete control of the matter of prohibiting parking in the city, see Sec. 64–15–8, N.M. Sts.1953, heretofore quoted); we would not be here today."

Again, referring to the trial court's refusal to grant their requested conclusion of law No. 6, denouncing ordinance No. 706 as void because enacted to carry out a contract in which the City had bartered away its police power, the effect of which was to give state highway commission a veto over the police power of the City, plaintiffs' counsel say:

"This raises a question of law and the court refused to adopt it as a conclusion of law. The Court was right if the City did not bargain away its police power. If it did, then the Court erred in not making this conclusion."

There it is in black and white and we have the plaintiffs' position in a nutshell. They do not question the City's power to enact a no parking ordinance in a reasonable exercise of the City's police power. They do not even question the reasonableness of this ordinance. The ordinance, however reasonable, is void because not enacted in a good faith exercise of the City's police power, to meet an emergent traffic problem, but rather in performance

of a covenant with the State acting through its highway commission, whereby it could secure for the City the greater part of the cost of the improvement. So say counsel for the plaintiffs.

In making the argument to support their position on this question, plaintiffs' counsel quote time and again the trial court's finding of fact No. 7, set out hereinabove. For convenience, we set it out again, as follows:

"7. One of the purposes of the Defendant City in passing said ordinance was to carry out the purported supplementary contract No. 2 between defendant City and the State by its Highway Commission."

This finding says no more than that one of its purposes in passing the ordinance was to carry out the City's contract with the State respecting the improvement of Second Street over the three blocks in question. It does not establish the claim of plaintiffs that the City was bartering away its police power in enacting the ordinance. No more so than does the quotation from the minutes of the Council meeting held August 8, 1953, reciting the motion of Alderman Littell "to restrict parking on Second Street between Richardson and the Railroad track, to comply with the State highway mandate," which was duly seconded and carried.

To be sure, it was a legitimate use of the finding and of the recitals in the minutes, as well, to endeavor through them to satisfy the court that the City, in truth, was not moving in a good faith exercise of its police power in enacting the ordinance in question. But as against these factors and others argued by counsel, the court had to weigh others of contrary import and even greater force tending to show the City was attempting to solve a pressing traffic problem that had plagued it for some time.

For instance, one of the purposes of the August 8, 1953, meeting of the City Council was to consider adequate safety measures in the light of existing traffic flow and the resulting congestion therefrom within the area Richardson Avenue to the Santa Fe railroad, by reason of two-way vehicular travel in four lanes upon an existing right of way 46 feet in width, each lane of traffic to be wide enough to meet minimum safety requirements for such travel upon the street. As indicated, the existing right of way upon Second Street, Richardson Avenue to the railroad, was 46 feet in width, whereas the existing right of way west of Richardson Avenue and east of the railroad upon said street was 52 feet in width, or wider, thereby giving rise to particular traffic hazards, to-wit, congestion due to the bottleneck created by travel flowing from the wider stretch of the street into the narrower.

That the city postponed imposing a no parking restriction in the area is disclosed by a resolution shown in the minutes of the meeting of the Council on March 30, 1954,

whereby the no parking rule between Richardson and the railroad tracks which had been enforced before was rescinded. Parking was thereafter allowed in the section of Second Street involved until July 6, 1954, at which time a regular meeting of the City Council took place.

Among other things done at this meeting, upon motion of Alderman Daniel, duly seconded and carried, parking on Second Street between Richardson Avenue and the railroad track was ordered eliminated by the 15th of July, 1954. This order of the City Council was enforced until ordinance No. 706 was passed and has continued until the trial of this cause and since. The foregoing recitals fairly indicate that the City was making a continuous, bona fide effort to solve the traffic problem besetting it. From time of the enactment of ordinance No. 706, and its effective date, the no parking restriction has been in effect.

The ordinance itself, as disclosed by a reading of it, after reciting the bottleneck created by the narrowed width of the street from Richardson Avenue easterly to the Santa Fe railway right of way and the congestion created thereby through the heavy flow of traffic in four lanes thereon, recites:

"* * * And, Whereas, it is hereby declared to be in the best interests of the safety and general welfare of the inhabitants of the City of Roswell to prohibit the parking of vehicles within such congested area as herein set forth."

While the courts are not bound by declarations of a legislative body that its enactment is in the interest of the public safety and welfare, they are not to be ignored; indeed, are entitled to great weight and will ordinarily be respected, unless obviously untrue or absurd. State ex rel. Hughes v. Cleveland, 47 N.M. 230, 141 P.2d 192. We may agree there are here present facts, appraised as plaintiffs appraise them, and writings interpreted as plaintiffs interpret them, which lend support to their claim that the City was willing to barter away its police power in exchange for the financial aid it was receiving in making the improvement.

But other and conflicting facts, the existence of a bona fide traffic problem on the City's door step,—the physical fact of two-way vehicular traffic flowing into and out of a bottleneck created by a sudden narrowing of the three-block stretch involved from a 52 to a 46-foot street, the council's declaration that it was moving in the interest of public safety and welfare contained in the ordinance, plus the presumption of good faith attending the council's exercise of discretion in the matter, absent a showing of fraud or conduct the equivalent of fraud (Oliver v. Board of Trustees of Town of Alamogordo, 35 N.M. 477, 1 P.2d 116)—all leaned away from the direction pointed by the plaintiff's character-

ization of the facts and toward the view of them adopted by the trial court.

■ In view of the foregoing, we must give it as our considered judgment there has been shown no sale or bartering away of the police power of the City in the control of its streets. So far as the briefs of the parties are concerned, the case nearest in point on its facts to the one before us is that of Bidlingmeyer v. City of Deer Lodge, 128 Mont. 292, 274 P.2d 821, 823.

In this case, a cooperative agreement between the City of Deer Lodge and Montana state highway commission had been entered into, somewhat akin to the one here involved between our state highway commission and the City of Roswell. Under the agreement the City's Main Street was to be made part of a federal aid highway. In consideration of the agreement, the Federal Government's bureau of public roads and Montana state highway commission would assume the greater part of expense of the improvement contemplated and three certain improvement districts along the route of the street through the city, created within the city, would share the remaining cost of the improvement on a basis expressed in the agreement.

A general demurrer to the complaint setting out the plan of the improvement was sustained and the plaintiffs, who had sued as taxpayers to enjoin the contemplated improvement, electing not to plead further, judgment was entered in favor of defendants from which the plaintiff prosecuted the appeal disposed of in the reported case. The closeness of this case to the one at bar on its facts will appear from the following quotation from the opinion. The court said:

"Does the complaint state facts sufficient to show that there has been an unauthorized abandonment by the city of its powers and duties with respect to the regulation of Main street.

"The complaint alleges that defendants, in order to have Main street paved, adopted resolution No. 483 on May 2, 1949, the important parts of which read: '2. That it will not pass any ordinances or laws fixing a speed limit on the above mentioned street of under 25 miles per hour. 3. That it will not allow the erection of signs, semaphores or signals that will give preference to local routes which intersect with said above mentioned street with the exception of necessary traffic lights. 4. That it will require stopping of traffic at all intersections, streets and alleys before entering the above mentioned street, with the exception of those intersecting streets where traffic is regulated by traffic lights and when traffic lights are in operation. 5. That it will modify its City Ordinance to require parallel parking on the above mentioned street. 6. That it will require that all opening of the pavement

be done under direct supervision of the State Highway Department to their complete satisfaction and that no opening of the pavement is to be done without prior authorization from the State Highway Department and upon posting an approved bond in an amount of one thousand dollars ($1,000.00).'

"The complaint then alleges that the resolution is an unauthorized attempt to relinquish the city's powers and duties over and upon Main street. It alleges that the resolution would prevent the city from slowing or stopping traffic along Main street for the benefit, safety and protection of school children or other pedestrians by creating, establishing or marking a safety zone or 'through street' intersecting and crossing Main street. Other like allegations are made as to the effect of the resolution in question.

"The general rule is that the police power of a municipal corporation cannot be divested by contract or otherwise. 37 Am.Jur., Municipal Corporations, § 276, p. 901. And generally speaking, it cannot be surrendered or delegated. Helena Light & Ry. Co. v. City of Helena, 47 Mont. 18, 130 P. 446. The source of the police power of municipalities is the state. 37 Am. Jur., Municipal Corporations, § 277, p. 902; Carey v. Guest, 78 Mont. 415, 258 P. 236; Helena Light & Ry. Co.

v. City of Helena, supra. The state, having delegated authority over the city streets to the cities, R.C.M.1947, §§ 11–912, 11–1002, the latter have exclusive control over them (Carey v. Guest, supra), but the state may take away or revoke a part or all of the authority which it has delegated to the cities."

Without conceding it had done so, the court said if some of the City's police power had been surrendered by virtue of the enabling act, under the arrangement shown for the right of the state to participate in federal aid, it would not void the agreement under attack. In this behalf, it was said:

"If in the adoption of resolution 483 some of the police power of the city was surrendered, the foregoing authorities sustain the right to do so where the state authorizes the highway commission to enter into all contracts and agreements with the United States government relative to the construction and maintenance of highways, and where the commission assents to the conditions prescribed by the federal works agency for the right of the state to participate in federal aid. The same reasoning sustains the right to require parallel parking."

Finally, the court closed this phase of its opinion, by concluding:

"The resolution does not surrender the police power of the city but merely places a limitation upon the method and means by which it may be exercised."

While willing to agree that the case from which we have quoted, extensively, does not present an exact parallel on its facts, it is close enough to ours, to afford a strong precedent in support of the conclusion we reach.

■ There is little to add to what has been said. We could cite cases in which this Court many times has held municipality in regulating traffic on its streets is exercising its police power, but why do so? The plaintiffs do not question that a no parking regulation normally represents an exercise by a municipality of its police power and are willing even to concede it to be a reasonable regulation; or, perhaps, more accurately stating their position, they do not assail the ordinance as unreasonable. This is shown by quotations from their briefs, supra.

They simply, and frankly and boldly assert invalidity of the ordinance upon the ground the City surrendered its police power in agreeing to enforce a no parking ordinance. And, to refine their argument further, they affirm such a conclusion arises as a matter of law from the City's covenant to enact a no parking regulation.

In other words, notwithstanding any showing the City might make as to an emergent traffic problem calling for such a regulation, even granting the safety hazard created by the physical facts shown might cry out for one which, absent the contractual covenant to provide it, would be upheld as a reasonable exercise of the police power; nevertheless, the ordinance is bad and unenforceable because of the City's promise to do, what, otherwise, it had a right and duty to do, receiving in exchange for the promise some financial benefit.

Such reasoning does not appeal to us as sound. In the first place, it lays a charge of bad faith against the action of the City in the premises. In the second place, in demanding the declaration, as a matter of law (which is what the plaintiffs' position amounts to), that the City abdicated and waived its police power, it would deny defendant the right to its day in court on whether it was not, at the same time, acting in good faith for the safety of all its inhabitants, in imposing the regulation it did. It is the unwillingness of the plaintiffs to concede the issuable character of the basic question presented, namely whether the City actually surrendered, or intended to surrender, by the agreement made its regulatory control over its streets, and as well the zeal and tenacity with which counsel have maintained their position here, that have caused us to give this case the unusual study and deliberation we have.

■ But it is said by counsel that the City lacked power to enter into a coopera-

tive agreement with the State through its highway commission for the improvement in question. Obviously, they would not question power of state highway commission to contract regarding a subject, the construction and maintenance of highways, representing so inherently the very purpose of its creation. Nor, who would question the power of the City to do on its own initiative, at its own cost, what it here has agreed to do in cooperation with state highway commission in the paving and widening of a segment of Second Street? This it was expressly empowered and enjoined to do by 1953 Comp. § 14–37–1 (L.1884, c. 39, § 73), reading:

> "The city council shall have the care, supervision and control of all public highways, bridges, streets, alleys, public squares and commons within the city, and shall cause the same to be kept open and in repair and free from nuisances."

Thus, the statute quoted gives it the power and enjoins upon it the duty to do what by virtue of the supplemental agreement it has contracted to do in cooperation with the state highway commission under an arrangement whereby the state will share the expense of the improvement up to a maximum amount of $175,892.51. Under the circumstances, it would have amounted almost to an act of nonfeasance for the members of the City Council to fail or refuse to commit the City to a saving of this large amount of money in providing a necessary improvement which, but for the opportunity thus afforded, the City would have to pay for in its entirety.

We see nothing either immoral or illegal in the agreement made. Where two separate governmental agencies, or political subdivisions, are committed by the inherent nature of each to the attainment of a common purpose or end, we know of no ethical consideration which proscribes nor any sound business practice which condemns, an agreement between the two to cooperate in achieving the common aim of both.

We should, perhaps, not close our opinion without mentioning the fact that the trial court, while basing its judgment on the fundamental finding there was here no surrender of the city's police power by the supplemental agreement and ordinance challenged; yet, it did not overlook a consideration pertinent to the claim of plaintiffs that they had suffered and, in the future would suffer, damage in the depreciated value of their property on the three blocks in question by the enforcement of said ordinance. As to this claim, if it had merit, the trial court concluded that the plaintiffs possessed a speedy, adequate and complete remedy at law for the redress of any injury their property may have suffered. See 1953 Comp. § 22–9–22 and compare cases of Summerford v. Board of Commissioners of Dona Ana County,

35 N.M. 374, 295 P. 410 and Hobbs v. Town of Hot Springs, 44 N.M. 592, 106 P.2d 856, which seem to lend support to the trial court in the conclusion drawn.

It follows from what has been said that the judgment of the trial court is correct and should be affirmed.

It is so ordered.

LUJAN, C. J., and COMPTON, J., concur.

KIKER, J., dissenting.

McGHEE, J., not participating.

KIKER, Justice (dissenting).

The opinion of the majority makes the following statement:

"The chief issue in the trial was the validity of municipal ordinance No. 706, enacted by the City following the execution of a cooperative agreement between it and the state highway department, relative to the widening and paving of a certain portion of a state highway traversing the City, to-wit, that section of Second Street lying between Richardson and Railroad avenues."

In the opinion is found the following also:

"* * * the record before us presents a single serious question for our determination, namely; Has the City of Roswell by the contract in question bartered away the exercise of its police power in imposing by the ordinance mentioned a no parking regulation on Second Street for the three blocks involved? If it has, of course, the plaintiffs are right and the trial court was wrong in the judgment it entered denying injunctive relief."

In the record it will be found that the city and the state, through its highway department, entered into three agreements regarding the street in question. There was the original contract, made on February 11, 1953, a first supplemental agreement, made on July 15, 1953 providing for the widening and the paving of a portion of Second Street in Roswell for a distance of three blocks extending from Richardson Avenue on the west to the railroad tracks of the Santa Fe on the east, and a second supplemental agreement on August 27, 1953. The first of these fixed a maximum sum to be paid by the state; the second supplement recited the making of the original contract and the first supplement, adopted both except as provided in it, and then obligated the state to participate in making partial payment to the contractor during the term of his contract and provided that the engineer in charge should cause progress estimates to be made of the work and that the estimates be on a form provided by the chief highway engineer of the state.

It further provided that inspection of work be made or approved of by the chief highway engineer of the state or his representative; that the state pay 85% of the proportionate share with the understanding that adjustment be made at the time of the making of final payment. In consideration of the obligations previously taken in the contracts and the obligation under the second supplemental agreement as just stated the city, by its officials, undertook to provide that it would not permit parking anywhere upon the street or highway except as permitted by written authority of the state; that it would permit no advertising signs, signboards, or devices within the right of way of the street or highway and that it would place no sign of any kind with reference to traffic on the highway or adjoining thereto without approval of the state; that the city would permit no removal, excavation or undermining, change or damage to such street without the express permission in writing from the state, and if any act such as just mentioned be permitted the city would guarantee to replace, fill or repair said street or highway to its original condition. This agreement was executed on behalf of the state by its chief highway engineer and was executed by the mayor and city clerk authorized thereto by resolution of the city council.

On the 9th day of August 1955 the city council enacted ordinance numbered 706 which is set out in full in the opinion of the majority. The chief effect of this ordinance is to provide penal provisions for the violation of that portion of the agreement previously entered into with respect to parking within the three block distance from Richardson on the west to the tracks of the Santa Fe railroad on the east.

I think the statement as to what is the chief issue in the case is mistakenly stated in the majority opinion. The bartering, if any, and I think there was bartering, was done by contract previous to the enactment of the ordinance.

The minutes of the meeting of August, 1953, show that the plans for widening the three block portion of Second Street were drawn up for four lanes of traffic, and one parking lane; that federal aid was requested and denied; that then the state offered one-third participation if the plans were left as drawn. The city issued bonds and construction work started, the plans being left as they had been drawn. This meeting occurred after the first of the supplemental agreements had been made.

The opinion of the majority as to the purpose of the meeting of the council held on August 8, 1953 is in direct conflict with the purpose of the meeting as stated by the president of the council immediately after the roll call of the members of the council. I quote from the minutes:

"The President announced the Special Meeting had been called to con-

sider the matter of prohibiting parking on Second Street between Richardson and the Railroad, and the street marking on the newly reconstructed street."

The opinion of the majority is that there were several purposes for holding that particular meeting. I quote from that opinion:

"For instance, one of the purposes of the August 8, 1953, meeting of the City Council was to consider adequate safety measures in the light of existing traffic flow and the resulting congestion therefrom within the area Richardson Avenue to the Santa Fe railroad, by reason of two-way vehicular travel in four lanes upon an existing right of way 46 feet in width, each lane of traffic to be wide enough to meet minimum safety requirements for such travel upon the street. As indicated, the existing right of way upon Second Street, Richardson Avenue to the railroad, was 46 feet in width, whereas the existing right of way west of Richardson Avenue and east of the railroad upon said street was 52 feet in width, or wider, thereby giving rise to particular traffic hazards, to-wit, congestion due to the bottleneck created by travel flowing from the wider stretch of the street into the narrower."

I do not find anything in the record which justifies the comments just quoted from the majority opinion as to the purpose of that meeting. The president of the council seems to have adequately and fully stated the purpose of the meeting. It appears from the minutes of the meeting that the president stated that agreements had been made with the State Highway Department before the commencement of reconstruction work on Second Street and that these agreements covered various phases of the work, but that

"Now the State was asking the City to eliminate parking on Second Street between Richardson and the Railroad. The president asked Alderman Littell to report on a meeting held months ago, with the Highway Commissioner, City Manager, and the Second Street merchants, and the Streets and Alleys Committee.

"Alderman Littell reported plans were drawn up for four lanes of traffic, one parking lane. Federal aid was requested and denied. Then the State offered $\frac{1}{3}$ participation if plans were left as drawn. The Bond Issue was floated, passed and construction started. Plans were left as they were. The Center line on the street should be laid so as to provide for the four driving lanes, and the one parking lane. Parking on the North or South side of the street was left to Council discretion."

Alderman Littell after making the statement of previous arrangements, as I understand it, next moved that as to Second

Street west from Richardson to Sunset parking be enforced on the south side of the street allowing for four eleven foot driving lanes "in compliance with the state requirement." The motion was carried.

Next a statement was made that between Richardson and the railroad Second Street be built forty-six feet in width with seven foot sidewalks; Alderman Littell further said that the State had required that all parking be eliminated on this portion of Second Street; thereupon he moved to restrict parking on Second Street between Richardson and the railroad tracks to comply with the State Highway Department mandate. By passing Mr. Littell's motion the council admitted that it was acting under the control of the State Highway Department.

In its supplemental agreement with the state on August 27, 1953 the city obligated itself "not (to) permit parking in, along, or upon said street or highway except as permitted by written authorization from the State." Not only did the city by the agreement last mentioned surrender its authority in the matter of permitting or restricting parking to the State Highway Department, but it surrendered also practically every other control of the three blocks of Second Street notwithstanding the statute which gives cities, towns and villages the control of all streets in all particulars.

The minutes of the city council for the meeting of March 30, 1954 show that:

"* * * the Special Called Meeting has been called to discuss the parking problem on Second Street, between Richardson and the Railroad tracks, posed by the Complete Elimination of parking on the three blocks involved, and subsequent protest from businesses and property owners affected. The City had eliminated parking in the area, under agreement with the State Highway Department."

A long discussion was had at this meeting, property owners and businessmen in the territory affected taking part in the discussion as well as members of the council. Alderman Burns then moved to restore parking in this part of the street immediately. This was done and as pointed out in the opinion of the majority, parking was continued until July 15, 1954.

The minutes of a meeting of the city council held July 6, 1954 show that the city council was again called upon by people seriously interested in the parking situation between Richardson and the Railroad. A statement was made by Alderman Russell as to the outcome of the meeting with Mr. Erwin, Chief Highway Engineer. It was said that the State required that parking be eliminated completely from the three blocks of Second Street, and that "the only alternative was to have it unpaved, or unim-

proved". It is also shown that the "city felt it was bound to honor its agreements with the State Highway Department". A motion was then made that parking on Second Street between Richardson and the railroad be eliminated by the 15th of July following. This ended the attempt on the part of the council to permit parking within this territory. It will be recalled that it had stopped parking several months during the previous year and then opened the street for parking at the March meeting and it is clear that the final action to stop parking between Richardson and the railroad tracks was at the direction of the Highway Department and in order to secure financial assistance in improving Second Street.

It seems to be the fact that the members of the city council were reluctant to prevent parking on Second Street; but when it became apparent that it was a matter of no parking or no paving with financial assistance from the State, the council yielded to the mandate of the State.

It is clear to my mind that in this particular case the city actually sold the authority delegated to it by the state acting through its legislature. Ordinance 706 was evidently passed to provide penalties for any parking within the three block area. The ordinance was so passed in conformity to agreements previously made with the State as to no parking. This is manifest by the third paragraph of the preamble to the ordinance. This reads:

"Whereas, the City Council of the City of Roswell has heretofore by its Motion of 8 August 1953 voted to eliminate the parking of vehicles within the said area and that it is deemed desirable and expedient to enact this Ordinance prohibiting the parking of vehicles within the area hereinabove set forth. Now, Therefore, Be It Ordained * * *"

Recalling that the motion referred to was that made by Alderman Littell to comply with the mandate of the State Highway Department, it appears that the ordinance preventing parking on Second Street within the area bounded on the west by Richardson and on the east by the railroad tracks was passed in the same spirit and with the same intent that moved the councilman to make his motion and the city council to pass it—to comply with the mandate of the Highway Department. The city can no more sell or give away or in any way delegate any of its legislative or discretionary powers to any other state organization than it can receive authority to exercise any power not already granted to it by the legislature. Municipal corporations receive their powers from the people of the state, acting through the legislature and they cannot barter away those powers. No rule of law is better settled than that the police power cannot be bartered away. Baker v. City of Princeton, 226 Ky. 409, 11 S.W.2d 94; Tilton v. City of Utica, Sup.,

60 N.Y.S.2d 249; City of Chicago v. O'Connel, 278 Ill. 591, 116 N.E. 210, 8 A.L.R. 916; City of Princeton v. Poole, 197 Ky. 248, 246 S.W. 819; Hudson County Water Company v. McCarter, 209 U.S. 349, 28 S.Ct. 529, 52 L.Ed. 828; 6 McQuillen on Municipal Corporations (3rd Ed.) § 24.41 et seq., pp. 530–532.

In the case of Risser v. City of Little Rock, 1955, 225 Ark. 318, 281 S.W.2d 949, 950 the city authorities and the county authorities entered into an agreement with the Fourche Dam Community east of Little Rock whereby certain streets and roads were to be closed and the city and county would jointly construct a new paved road in an agreed location. This agreement was modified later so that the city undertook to improve East 10th street and to improve and maintain East 26th street with a right of way of 160 feet. Appellants in the case had filed suit to enjoin the city from abandoning the old routes in favor of new ones. The Chancellor denied the injunction and the residents of the Fourche Community have appealed. The appellants, among other things, contended that the city was precluded from closing the roads by a contract made with the residents of the area. From the opinion of the case, I quote:

"Any attempt on the part of the city to enter into a contract relating to the permanent establishment or abandonment of its public streets would be ultra vires. In establishing, maintaining or abandoning its streets, the city acts in a governmental capacity and no city administration has the authority to bind a future administration in such matters. Cities have the authority to control, supervise and regulate all streets within their corporate limits. Ark.Stats. §§ 19–2313, 19–2304. 'A municipality cannot bind itself by a perpetual contract, or by one which lasts an unreasonable length of time. Thus, a municipal corporation cannot obligate itself to keep a particular street open forever.' 38 Am.Jur. 174. It is also said in 25 Am.Jur. 553: 'It is established that the governmental power to control and regulate the use of highways in the public interest cannot be surrendered, or impaired by contract. Particularly as to municipalities, control over streets is given to them for the benefit of the public. It is in the nature of a trust held by the corporation, from which arises a continuing duty on the part of such corporations to exercise legislative control over their streets at all times and places when demanded by the public good. They have no power, by contract, ordinance, or by law, to cede away limit, or impair their legislative or governmental powers, or to disable themselves from performing their public duties in this regard, at least with-

out the explicit consent of the legislature, or to delegate the exercise of such powers and the performance of such duties to others, so as to relieve themselves of responsibility in this respect.' "

In 1954 the Supreme Court of South Carolina had under consideration the proposition above discussed and in the case of Sammons v. City of Beaufort, 225 S.C. 490, 83 S.E.2d 153, 157, said:

"It is a fundamental principle of constitutional law that no legislative body may part with its right to exercise the police power, nor may a municipality to which such power has been delegated divest itself of same by contract or otherwise. It is a continuing power which may be exercised as often as required in the public interest and must always remain fluid. Douglas v. City Council of Greenville, 92 S.C. 374, 75 S.E. 687, 49 L.R.A.,N.S., 958; 11 Am.Jur., Constitutional Law, Section 254.

"We think that the covenant to maintain during the life of these bonds parking meters on the streets of Beaufort and to charge fees for the use of parking spaces thereon sufficient to service said bonds, constitutes an ineffective attempt to barter away the police power. The Legislature may not authorize the City Council of Beaufort to adopt a system of on-street parking and make it irrevocable during the life of the bonds, so as to preclude a future council from adopting some other, and better, method of regulating traffic, or from prohibiting parking entirely on any or all of the streets. The governing body of the City of Beaufort must be left unrestricted in the future to adopt any parking regulations necessary for the public safety and welfare."

Further authority would seem to be unnecessary to support the proposition of law that a city may not barter away its police power or any part thereof.

In the case before us the city of Roswell has clearly undertaken to barter away, I think every vestige of its police power over the three blocks in question. Not only has the city, if its contract with the State Highway Department is valid, lost all control as to questions of parking in the three blocks, but it can do nothing in those three blocks in the exercise of its control of the streets of the city delegated to it by statute, without the written approval of the State Highway Department. The city can no longer mend a hole in the paving within the three blocks, if one should appear, without getting written consent from the State Highway Department, though the city and not the State Highway Department would be liable in damages to any one injured by neglect about keeping up one of its

streets. No longer can the city, without getting written permission from the State Highway Department, open the paving to take care of broken or leaking water or sewer pipes, if its contract is good.

It is true that in the third clause of the preamble to the ordinance the city, when enacting it, made a declaration as to interest in the safety and the welfare of the whole of the city, but it likewise is true that it followed that declaration with the statement which shows that the real basis for the passage of the ordinance was to keep faith with the State Highway Department with reference to the motion adopted at the August 8th meeting of 1953 when the city undertook to eliminate all parking within the three blocks at the mandate of the State Highway Department. The order is therefore the development and culmination of the agreement entered into between the city and the State Highway Department whereby the city attempted to surrender all its powers over the three blocks of Second Street. The city made that attempt for the purpose of obtaining financial assistance from the state.

That the city could make no such surrender whether by contract or by ordinance I think has been shown clearly. The contract is invalid and the ordinance was enacted upon the same consideration and is likewise invalid in my opinion.

I dissent.